Anna T. Neill (State Bar No. 270858)
KENNY NACHWALTER, P.A.
Four Seasons Tower, Suite 1100
1441 Brickell Avenue
Miami, Florida 33131
Telephone:      (305) 373-1000
Facsimile:       (305) 372-1861
Email: aneill@knpa.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALGREEN CO., THE KROGER CO., ALBERTSONS COMPANIES, INC. and H-E-B, L.P., | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | **Case No.** |
| v. | |
| GILEAD SCIENCES, INC., GILEAD SCIENCES, LLC (f/k/a BRISTOL-MYERS SQUIBB & GILEAD SCIENCES, LLC), BRISTOL-MYERS SQUIBB and TEVA PHARMACEUTICALS USA, INC., | |
| Defendants. | |

Plaintiffs Walgreen Co., The Kroger Co., Albertsons Companies, Inc. and H-E-B, L.P. (collectively, "Plaintiffs") bring this civil action against Defendants Gilead Sciences, Inc., Gilead Sciences, LLC (f/k/a Bristol-Myers Squibb & Gilead Sciences, LLC) (collectively "Gilead"), Bristol-Myers Squibb ("BMS") and Teva Pharmaceuticals USA, Inc. ("Teva") under the antitrust laws of the United States.  For their Complaint, Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This is a civil antitrust action brought by purchasers of certain antiretroviral drugs used to treat patients with Human Immunodeficiency Virus ("HIV").  Defendants have collectively engaged in a multifaceted scheme to suppress and delay generic competition for those

1

1  drugs, including unlawful reverse-payment agreements.  Plaintiffs seek overcharge damages and

2  other relief arising out of Defendants' unlawful foreclosure of generic competition in the markets

3  for those drugs.

4          2.      This action challenges ongoing restraints of trade that have effectively curtailed

5  generic competition for seventeen critical antiretroviral medications used in the treatment of

6  patients with HIV, a condition that, left untreated, destroys the immune system and leads to

7  Acquired Immunodeficiency Syndrome ("AIDS").  The antiretroviral medications at issue include

8  Gilead's Viread (tenofovir disoproxil fumarate ("TDF")) and generic versions of Viread; Truvada

9  (a combination of Viread (TDF) and emtricitabine ("FTC")) and generic versions of Truvada;

10  Atripla (a combination of Truvada (TDF and FTC) and efavirenz ("EFV")) and generic versions

11  of Atripla; Gilead's Vemlidy ( tenofovir alafenamide fumarate ("TAF")) and generic versions of

12  Vemlidy; and Descovy (TAF and FTC) and generic versions of Descovy.  Viread, Truvada and

13  Atripla, and their respective generic equivalents, are examples of TDF-based drugs.  Vemlidy and

14  Descovy, and their respective generic equivalents, are examples of TAF-based drugs.  Each of

15  these medications consists of one or more component drugs of the nucleotide/nucleoside

16  analogous reverse transcriptase inhibitor ("NRTI") class, which includes TDF, TAF and FTC.

17          3.      Gilead owns the patents (or has obtained exclusive licenses to the technology) for

18  the component drugs TDF, TAF and FTC, as well as for the branded drugs Viread, Truvada,

19  Atripla, Vemlidy and Descovy. As each drug's patent was challenged or set to expire, Gilead

20  entered into unlawful and anticompetitive arrangements with BMS, Teva and other entities to

21  delay and suppress entry of cheaper generic versions of each drug. The net result is that Plaintiffs

22  and other purchasers of the relevant drug have overpaid hundreds of millions of dollars for those

23  drugs.

24          4.      HIV is one of the deadliest human pandemics in history. Since the first cases were

25  reported in the summer of 1981, more than 700,000 people in the United States ("U.S.") and 35

26  million worldwide, have perished from the disease. In the United States, the HIV epidemic is still

27  ongoing. The Centers for Disease Control and Prevention ("CDC") reported that in 2017, the last

28  year for which data is available, an estimated 1.1 million people in the U.S. were living with HIV,

2

COMPLAINT AND DEMAND FOR JURY TRIAL

1  nearly 40,000 people were newly diagnosed with it, and more than 5,000 Americans perished

2  from it.

3       5.     Improved access to antiretroviral therapies ("ART") that durably suppress the

4  virus prevents the development of AIDS in persons living with HIV and decreases the likelihood

5  of transmission of HIV to others. Current HIV treatments are highly effective, but not curative.

6  Available treatments help people with HIV live longer, healthier lives, but do not eliminate the

7  virus from the human body or prevent reemergence of the virus when the treatment is

8  discontinued.  Access to affordable HIV medications is an absolute necessity to preventing

9  infections and maintaining treatment for those living with HIV.

10       6.     As drug-resistant strains of HIV continue to emerge, treatment strategies often

11  combine multiple ARTs from different drug classes, also known as combination ARTs ("cART").

12  The backbone for most cART regimens typically consists of NRTIs, which function as analogs of

13  the naturally occurring deoxynucleosides and deoxynucleotides needed to synthesize the viral

14  DNA. Thus, they can disrupt the reverse transcription process needed to generate the HIV DNA,

15  thereby preventing integration of the proviral DNA into the genome of human cells.

16       7.     At all relevant times, Gilead was the exclusive or dominant maker of TDF and

17  TAF – two of the principal NRTIs used in any cART regimen. TDF and TAF are prodrugs of the

18  same parent molecule tenofovir and are similar in structure. Prodrugs are pharmacologically

19  inactive compounds that, once administered, undergo a conversion by the body's metabolic

20  processes to become an active pharmacological agent.

21       8.     TDF and TAF are often used in conjunction with another NRTI, specifically either

22  FTC or lamivudine ("3TC"). When an HIV virus becomes resistant to either FTC or 3TC, the

23  virus's susceptibility to TDF and TAF increases. Thus, the combination of TDF or TAF with

24  either FTC or 3TC makes it more difficult for the virus to develop resistance to a cART regimen.

25       9.     FTC and 3TC are remarkably similar, varying by the substitution of only a single

26  hydrogen atom in 3TC, with a fluorine atom in FTC in the 5-prime position of the cytosine ring.

27  Both the U.S. Department of Health and Human Services ("HHS") and the World Health

28  Organization ("WHO") guidelines stipulate that the drugs, when used for HIV treatment, can be

3

COMPLAINT AND DEMAND FOR JURY TRIAL

used interchangeably. Any cART regimen using FTC can use 3TC instead, and vice versa, without a reduction in therapeutic efficacy.

10.     The ability to use 3TC instead of FTC is important to the antitrust claims here. Gilead owns and currently still has patent protection for FTC, but generic 3TC has been available in the U.S. since 2012. Thus, when generic TDF became available in December 2017, the price of cART regimens should have dropped precipitously because two generic NRTIs—3TC and TDF—were available in the marketplace. Gilead and its co-conspirators prevented those price drops from occurring.

11.     Defendants deliberately and unlawfully delayed generic competition for life-saving TDF-based products, including Viread, Truvada and Atripla, by entering into anticompetitive settlement agreements. As a result, Gilead and Teva, individually and collectively, were able to retain hundreds of millions of dollars in anticompetitive profits at the expense of purchasers such as Plaintiffs. With full knowledge that the launch of generic versions of TDF-based HIV medications would dramatically reduce pricing, Defendants engaged in such exclusionary conduct to wrongfully insulate themselves from competition, in order to maintain exorbitant pricing and earn outsized profit margins. Defendants' unlawful conduct directly resulted and continues to result in the payment of overcharges for TDF-based HIV Medications.

12.     Gilead deliberately and purposefully delayed the development and introduction of superior TAF for over a decade in order to extend its monopoly and earn supracompetitive profit margins on its TDF-based HIV Medications. Only once generic competition was imminent did Gilead introduce TAF, simultaneously engaging in an unlawful product-hopping scheme to switch TDF-based prescriptions to TAF-based prescriptions.

13.     In connection with these settlement agreements, collusive collaborations and product-hopping schemes, Gilead unfairly increased the already exorbitant pricing for its HIV medications to wring the last bit of available profits from its HIV franchises when faced with imminent generic competition.

14.     One of Gilead's most lucrative product-hopping and deceptive marketing schemes involved Truvada and Descovy, which are used as a pre-exposure prophylaxis ("PrEP")—one of

4

the most effective ways to prevent infections in individuals not currently diagnosed with HIV. The use of PrEP is of the utmost importance to public health, and PrEP medications are indispensable in terms of ending the HIV/AIDS epidemic in the U.S. As a result, Truvada for PrEP is covered in all State Medicaid programs.

15.     Defendants' calculated and concerted conduct produced billions of dollars in profits for Defendants.  Indeed, today more than 80% of U.S. patients on an HIV treatment regimen take one or more of Gilead's products, and Gilead's blockbuster HIV medications comprise a substantial portion of its total sales and financial portfolio. In 2019 alone, annual U.S. sales for Truvada amounted to $2.64 billion.  Descovy sales top a billion dollars. Defendants' anticompetitive actions needlessly raised prices for life-saving medications, stifled innovation, and were and continue to be a burden on drug purchasers and patients.

16.     The effects of generic competition for a brand drug are predictable: when the generic launches, sales switch quickly from the brand drug to the generic version. Generic drugs are priced at a fraction of the brand drug price, with prices for the generics falling farther as more generics enter the market, and purchasers shift swiftly to the generics. Brand manufacturers' profits fall dramatically upon generic entry.

17.     Plaintiffs bring this action to recover overcharge damages they have already paid and will continue to pay for the Relevant Drugs (defined below) and to obtain equitable relief to stop ongoing harm.

## II.     JURISDICTION AND VENUE

18.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and § 26, and seeks to recover threefold damages and other relief for the injuries sustained by Plaintiffs resulting from Defendants' unlawful restraints of trade and maintenance of monopoly power in the product markets for seventeen HIV drugs:  Viread; Truvada; Atripla; Emtriva; Vemlidy; Prezista; Reyataz; Edurant; Tybost; Complera; Stribild; Genvoya; Odefsey; Symutza; Descovy; Evotaz; and Prezcobix (the "Relevant Drugs").  Each Relevant Drug and its respective AB-rated generic equivalents, if any, constitute a separate relevant product market.  There is also a relevant product

COMPLAINT AND DEMAND FOR JURY TRIAL

1  market consisting of all cART drugs, which Gilead dominates.  The Court has subject matter

2  jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

3          19.     Defendants transact business within this district, and they carry out interstate trade

4  and commerce in substantial part in this district and/or have an agent and/or can be found in this

5  district.  Venue is therefore appropriate within this district under section 12 of the Clayton Act, 15

6  U.S.C. § 22, 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1407.

7                          **III.      PARTIES**

8          20.     Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal

9  place of business at 200 Wilmot Road, Deerfield, Illinois 60015.  Walgreen owns and operates

10  retail stores in several states at which it dispenses prescription drugs to the public, including the

11  Relevant Drugs.  Walgreen brings this action on its own behalf and as the assignee of

12  AmerisourceBergen Drug Corporation, a pharmaceutical wholesaler, which during the relevant

13  period purchased the Relevant Drugs directly from Defendants for resale to Walgreen and which

14  has expressly assigned its claims arising out of those purchases to Walgreen.

15          21.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal

16  place of business at 1014 Vine Street, Cincinnati, Ohio 45202.  Kroger owns and operates retail

17  stores in several states at which it dispenses prescription drugs to the public, including the

18  Relevant Drugs.  Kroger brings this action on its own behalf and as the assignee of Cardinal

19  Health, Inc., a pharmaceutical wholesaler, which during the relevant period purchased the

20  Relevant Drugs directly from Defendants for resale to Kroger and which has expressly assigned

21  its claims arising out of those purchases to Kroger.

22          22.     Plaintiff Albertsons Companies, Inc. ("Alberstons") is a Delaware corporation

23  having its principal place of business at 250 Parkcenter Boulevard, Boise Idaho 83706.

24  Albertsons' affiliates own and operate retail stores in several states at which they dispense

25  prescription drugs, including the Relevant Drugs, to the public.  Albertsons brings this action on

26  its own behalf and as the assignee of McKesson Corporation ("McKesson"), a pharmaceutical

27  wholesaler, which during the relevant period purchased the Relevant Drugs directly from

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1    Defendants for resale to Albertsons' subsidiaries and which has expressly assigned its claim

2    arising out of those purchases to Albertsons.

3         23.    Plaintiff H-E-B, L.P. ("HEB") is a Texas limited partnership having its principal

4    place of business at 646 South Main Avenue, San Antonio, Texas 78204.  HEB owns and

5    operates retail stores at which it dispenses prescription drugs to the public, including the Relevant

6    Drugs.  HEB brings this action on its own behalf and as the assignee of McKesson, which during

7    the relevant period purchased the Relevant Drugs directly from Defendants for resale to HEB and

8    which has expressly assigned its claims arising out of those purchases to HEB.

9         24.    Defendant Gilead Sciences, Inc. is a Delaware corporation having its principal

10   place of business at 333 Lakeside Drive, Foster City, California 94404.

11        25.    Defendant Gilead Sciences, LLC (f/k/a Bristol-Myers Squibb & Gilead Sciences,

12   LLC) is a Delaware limited liability company having its principal place of business at 333

13   Lakeside Drive, Foster City, California 94404.  Gilead Sciences, LLC is now a wholly owned

14   subsidiary of Gilead Sciences, Inc.

15        26.    Defendant Bristol-Myers Squibb Company is a Delaware corporation having its

16   principal place of business at 430 East 29th Street, Fourteenth Floor, New York, New York

17   10016.

18        27.    Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its

19   principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.

20        28.    Other persons and entities not named as Defendants joined and participated in

21   Defendants' unlawful conspiracies in restraint of trade.

22        29.    All of Defendants' actions described in this complaint are part of, and in

23   furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by

24   Defendants' various officers, agents, employees, or other representatives while actively engaged

25   in the management of Defendants' affairs (or that of their predecessors-in-interest) within the

26   course and scope of their duties and employment, and/or with the actual, apparent, and/or

27   ostensible authority of Defendants.

28

7

COMPLAINT AND DEMAND FOR JURY TRIAL

1

## IV.     REGULATORY BACKGROUND

2

### A.     Characteristics of the Prescription Pharmaceutical Marketplace.

3       30.     The marketplace for the sale of prescription pharmaceutical products in the United

4   States suffers from a significant imperfection that brand manufacturers can exploit in order to

5   obtain or maintain market power in the sale of a particular pharmaceutical composition.  Markets

6   function best when the person responsible for paying for a product is also the person who chooses

7   which product to purchase.  When the same person has both the payment obligation and the

8   choice of products, the price of the product plays an appropriate role in the person's choice of

9   products and, consequently, the manufacturers have an appropriate incentive to lower the prices

10  of their products.

11      31.     The pharmaceutical marketplace, however, is characterized by a "disconnect"

12  between the payment obligation and the product selection.  State laws prohibit pharmacists from

13  dispensing many pharmaceutical products, including each of the Relevant Drugs, to patients

14  without a prescription written by a doctor.  The prohibition on dispensing certain products

15  without a prescription introduces a disconnect between the payment obligation and the product

16  selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the

17  pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

18      32.     Brand pharmaceutical sellers exploit this price disconnect by employing large

19  forces of sales representatives to visit doctors' offices and persuade them to prescribe the

20  manufacturer's products.  These sales representatives do not advise doctors of the cost of the

21  branded products.  Moreover, studies show that doctors typically are not aware of the relative

22  costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are

23  insensitive to price differences because they do not have to pay for the products.  The result is a

24  marketplace in which price plays a comparatively unimportant role in product selection.

25      33.     The relative unimportance of price in the pharmaceutical marketplace reduces

26  what economists call the price elasticity of demand – the extent to which unit sales go down when

27  price goes up.  This reduced price elasticity in turn gives brand manufacturers the ability to raise

28  price substantially above marginal cost without losing so many sales as to make the price increase

8

COMPLAINT AND DEMAND FOR JURY TRIAL

unprofitable.  The ability to profitably raise price substantially above marginal cost is what economists and antitrust courts refer to as market power.  The result of the market imperfections and marketing practices described above is to allow brand manufacturers to gain and maintain market power with respect to many branded prescription pharmaceuticals.

**B.**     **The Regulatory Structure for Approval of Generic Drugs and the Substitution of Generic Drugs for Brand Name Drugs.**

34.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a), (b).

35.     When the FDA approves a brand manufacturer's NDA, the drug product is listed in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book."  The manufacturer must list in the Orange Book any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.  The manufacturer must list in the Orange Book any such patents that issue after the FDA approves the NDA within thirty days of issuance.    21 U.S.C. §§ 355(b)(1) & (c)(2).

36.     The FDA relies completely on the brand manufacturer's truthfulness in submitting patents to be listed, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

**C.**     **The Hatch-Waxman Amendments.**

37.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.  See Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).  A manufacturer seeking approval to sell a generic version of a brand drug

9

COMPLAINT AND DEMAND FOR JURY TRIAL

may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns an "AB" rating to a generic drug that is therapeutically equivalent to a brand-name counterpart.

38.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B).

39.     Congress had two goals in enacting the Hatch-Waxman Amendments. First, it sought to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide. Second, it sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

40.     To incentivize the development of new drugs, the Hatch-Waxman Amendment created a 5-year period of new chemical entity ("NCE") exclusivity. Following the approval of an NDA for a drug that has not been approved in any other application, no ANDA may be submitted for that drug for 5 years (or 4 years if the ANDA contains a paragraph IV certification, as discussed in the next section).

41.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription

10

1   drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug

2   revenue had soared to $300 billion.

3       **D.   Paragraph IV Certifications.**

4       42.   To obtain FDA approval of an ANDA, a manufacturer must certify that the generic

5   drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman

6   Amendments, a generic manufacturer's ANDA must contain one of four certifications:

7       i.   that no patent for the brand drug has been filed with the FDA (a "Paragraph I

8       certification");

9       ii.   that the patent for the brand drug has expired (a "Paragraph II certification");

10      iii.   that the patent for the brand drug will expire on a particular date and the

11      manufacturer does not seek to market its generic product before that date (a "Paragraph III

12      certification"); or

13      iv.   that the patent for the brand drug is invalid or will not be infringed by the generic

14      manufacturer's proposed product (a "Paragraph IV certification").

15      43.   If a generic manufacturer files a Paragraph IV certification, a brand manufacturer

16  can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent

17  infringement.  If the brand manufacturer initiates a patent infringement action against the generic

18  filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph

19  IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the

20  passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not

21  infringed by the generic manufacturer's ANDA.  Until one of those conditions occurs, the FDA

22  may grant "tentative approval," but cannot authorize the generic manufacturer to market its

23  product.  The FDA may grant an ANDA tentative approval when it determines that the ANDA

24  would otherwise be ready for final approval but for the 30-month stay.

25      44.   As an incentive to spur manufacturers to seek approval of generic alternatives to

26  branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV

27  certification typically gets a period of protection from competition from other generic versions of

28  the drug.  For Paragraph IV certifications made after December 2003, the first generic applicant

11

receives 180 days of market exclusivity (unless some forfeiture event, like that discussed below, occurs). This means that the first approved generic is the only available generic for at least six months, which effectively creates a duopoly between the brand company and the first-filing generic during this period. This 180-day exclusivity period is extremely valuable to generic companies. When there is only one generic on the market, the generic price is lower than the branded price, but much higher than the price after multiple generic competitors enter the market. Generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, but this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market. Being able to sell at the higher duopoly price for six months may be worth hundreds of millions of dollars.

45.     Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months. That brand manufacturers often sue generics under Hatch-Waxman simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation, by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal, in cases involving 73% of the drug products studied.

46.     The first generic applicant can help the brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic manufacturers. By agreeing not to begin marketing its generic drug, the first generic applicant delays the start of the 180-day period of generic market exclusivity. This tactic is called exclusivity "parking." It creates a "bottleneck" because later generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

47.     On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first filer's 180-day period of

12

COMPLAINT AND DEMAND FOR JURY TRIAL

1    generic market exclusivity.  The MMA outlines a number of conditions under which an ANDA

2    applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to

3    launch their generic products.  For example, forfeiture occurs if the first ANDA applicant fails to

4    obtain tentative approval from the FDA within 30 months of filing a substantially complete

5    ANDA, unless the failure is caused by a change in or review of the approval requirements.

6    Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within

7    the requisite 30 months.

8          48.    Under the "failure to market" provision, a first ANDA applicant forfeits 180- day

9    exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is

10   (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its

11   ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that

12   qualified the first applicant for exclusivity (*i.e*., as to each patent for which the first applicant

13   submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final

14   decision of invalidity or non-infringement; (ii) a settlement order entering final judgment that

15   includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the

16   patent from the Orange Book.

17         49.    Brand manufacturers and first-filing generics can settle patent lawsuits in ways

18   that intentionally skirt these forfeiture provisions.  For example, manufacturers can subvert the

19   failure-to-market provisions and keep the 180-day exclusivity bottleneck in place by settling

20   patent litigation before a final judgment of invalidity or non-infringement can be entered with

21   respect to each of the patents for which the first applicant submitted a Paragraph IV certification,

22   or seeking a consent judgment that does not include a finding that all of the patents for which the

23   first applicant submitted a Paragraph IV certification were invalid or not infringed. When that

24   happens, in order to trigger forfeiture and gain access to the market, subsequent ANDA applicants

25   must obtain a judgment that all patents for which the first filing generic company filed Paragraph

26   IV certifications are invalid or not infringed. This may require the subsequent ANDA applicant to

27   initiate a declaratory judgment action concerning patents that the brand manufacturer did not

28   assert against it in a Paragraph IV litigation.

13

50.     In addition, brand and generic manufacturers can structure their settlements to provide the generic with180 days of *de facto* exclusivity even when it is likely that the generic has forfeited that exclusivity under one of the applicable MMA forfeiture provisions, *e.g.*, the failure to obtain tentative approval within 30 months of submitting a substantially complete ANDA.  The brand can provide such exclusivity by agreeing not to license any other generic to enter the market any earlier than six months after the generic that has forfeited exclusivity has entered.  Unless a subsequent generic is itself able to overcome applicable patent and regulatory exclusivities, such an agreement effectively restores the first generic filer's lost statutory exclusivity. This results in a windfall to the generic and a subversion of the regulatory scheme.  Because the FDA will not typically make a formal 180-day exclusivity determination until another generic applicant has received final approval and is ready to launch, settlements that confer de facto exclusivity – even where de jure exclusivity has been forfeited under the MMA – dissuade subsequent generic applicants from trying to obtain a court judgment of invalidity and/or infringement that would trigger the start of the 180 day period.  And, because the lion's share of the generic revenues will perceivably go to the first filer, subsequent filers have less incentive to litigate to judgment.

### E.     The Benefits of Generic Drugs.

51.     Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers.  The Federal Trade Commission estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  As a result, competition from generic drugs is viewed by brand name drug companies such as Gilead as a grave threat to their bottom lines.

14

COMPLAINT AND DEMAND FOR JURY TRIAL

52.     Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart.  Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing  "dispense as written" or similar language on the prescription).

53.     There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain.  Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.  Health insurers and patients also benefit from the lower prices that result from generic competition.

54.     Generic competition enables Plaintiffs and their assignors to purchase generic versions of the drug at substantially lower prices.

55.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices without losing substantial sales.  As a result, brand manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay the introduction of generic competition into the market, including through tactics such as those alleged here.

**F.      The Impact of Authorized Generics.**

56.     The 180-day marketing exclusivity to which first filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day exclusivity period.  Such a generic is called an "authorized generic" and is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer.  Competition from an authorized generic during the 180-day exclusivity period substantially reduces the first filer's revenue, and substantially reduces drug prices for consumers.

15

57.     In its study, Authorized Generic Drugs: Short-term Effects and Long-Term Impact (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales and reduce the first filer generic's revenues by approximately 50% on average during the 180-day exclusivity period.  The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

58.     Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other drug purchasers such as Plaintiffs benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

59.     As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated generic drugs. Brand-name manufacturers generally do not reduce the price of their branded drugs in response to the entry of AB-rated generics.  Instead, they either raise the price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the branded drugs at the same intervals and at the same rate at which they raised the price of the drugs prior to generic entry.

60.     Given the significant negative impact of an authorized generic on the first-filing generic's revenues, and the absence of any other form of price competition from the branded manufacturer, a brand manufacturer's agreement not to launch an authorized generic has tremendous economic value to a generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first filer to delay entering the market.  Such agreements deprive drug purchasers such as Plaintiffs of the lower prices resulting from two forms of competition. During the initial period of delay agreed to by the ANDA filer, they effectively eliminate all competition from AB-rated generic products and allow the brand manufacturer to preserve its monopoly.  And, during the period in which the branded company has agreed not to sell an

16

COMPLAINT AND DEMAND FOR JURY TRIAL

1  authorized generic, they eliminate competition between the ANDA filer's generic and the

2  authorized generic, giving the ANDA filer a monopoly on generic sales.

3      61.     As a means of compensating first-filing generic manufacturers, brand

4  manufacturers prefer no-AG agreements to cash payments because, in the case of no-AG

5  agreements, a portion of the compensation is paid by purchasers of the drug in the form of higher

6  generic drug prices.  The generic manufacturer receives not only the profits that the brand

7  manufacturer would have made by launching an authorized generic in competition with the

8  ANDA filer's product, but also the higher prices that result from the absence of that competition.

9  Thus, the payment to the generic manufacturer is shared between the brand manufacturer and the

10  generic manufacturer's customers.

11                          **V.   OPERATIVE FACTS**

12      **A.     Reverse-Payment Agreement: Viread**

13      62.     Viread is an NRTI indicated for the treatment of HIV-1 infection in adults and

14  pediatric patients two years of age or older. Viread is also indicated for the treatment of chronic

15  Hepatitis B in adults and patients 12 years of age or older. The FDA approved Viread in October

16  of 2001.

17      63.     Viread (TDF) is a prodrug formulation of tenofovir. Prodrugs are

18  pharmacologically inactive compounds that, once administered, undergo a conversion by the

19  body's metabolic processes to become an active pharmacological agent.

20      64.     Tenofovir is one of the most common NRTI drugs used in the U.S. for

21  antiretroviral therapy. Gilead did not invent tenofovir. Tenofovir was first invented and patented

22  in the 1980's by Czech scientists. The patents covering the compound tenofovir expired long

23  ago.

24      65.     Gilead created Viread as a prodrug formulation of tenofovir that could be

25  absorbed through the patient's intestine. Gilead never obtained any patents on the parent

26  molecule tenofovir.  Instead, Gilead's patents pertain to converting tenofovir into the prodrug

27  TDF that could be absorbed through the patient's intestine. The process for converting such

28

COMPLAINT AND DEMAND FOR JURY TRIAL

compounds into prodrugs would have been obvious to those reasonably trained in the field for years. Prodrugs were not new or novel at the time Gilead obtained its patents.

66.     Viread has been an enormously successful drug for Gilead. After launching in late 2001, Viread quickly became a blockbuster drug. In 2003, Gilead earned $566.5 million in sales and royalty revenues from Viread. In 2004, that number jumped to $782.9 million.  After many years of stable sales of approximately $650-$950 million per year, Viread crossed the $1 billion plateau in 2014. Viread was a $1 billion per year drug thereafter through 2017.  Teva launched generic Viread on December 15, 2017.

67.     Gilead's Viread patent portfolio consists of U.S. Patents Nos. 5,922,695 ("the '695 Patent"), 5,977,089 ("the '089 Patent"), and 6,043,230 ("the '230 Patent"). These three patents all derive from the same patent application and cover Gilead's tenofovir disoproxil prodrug. The 5,935,946 ("the '946 Patent") claims the fumarate salt of tenofovir disoproxil (collectively the four patents are referred to herein as "the TDF patents").

68.     Gilead did not invent the technology in the majority of patents allegedly protecting Viread.  Instead of innovating itself, Gilead licensed intellectual property resulting from the prior inventions and research of others. Gilead obtained an exclusive license to manufacture and use of TDF from the Czech institutions that invented it.  In 1991 and 1992, Gilead entered into an agreement with the Czech institutions for the exclusive right to manufacture, use and sell Viread in exchange for payment of a percentage of net revenues received "subject to minimum royalty payments."  In 2000, in anticipation of Viread's launch, the agreements were amended to provide for a reduced royalty rate on future sales of products incorporating tenofovir in return for a modest upfront payment from Gilead.

69.     Patents are intended to encourage innovation by offering protection from competition for inventions that are novel, useful, and non-obvious. However, a large number of issued patents should not have been issued. A 2003 report by the Federal Trade Commission found that the average patent application gets approximately 15-20 hours of review time by the U.S. Patent and Trademark Office's ("PTO") assigned examiner. Despite receiving hundreds of

COMPLAINT AND DEMAND FOR JURY TRIAL

thousands of patent applications each year, the PTO grants approximately eighty-five percent (85%) of patent applications that it receives.

70.     Brand pharmaceutical companies have increasingly engaged in a patent procurement strategy sometimes referred to as "evergreening." "Evergreened" patents are patents that do not cover the active pharmaceutical ingredient, or API, but rather claim some ancillary aspect of the drug, such as its delivery method or release mechanism. These "evergreened" patents – if litigated to judgment – have a high rate of being found invalid or not infringed.

71.     Because the API tenofovir was not patent-protected, the Viread TDF patent portfolio at most covered only Gilead's prodrug formulation, tenofovir disoproxil, and its fumarate salt. These ancillary patents were weak and likely to be invalidated.

72.     Viread's NCE exclusivity expired on October 26, 2006, so any 30-month stay blocking FDA approval of competing generics could have expired as early as April 26, 2009. Therefore, if a generic manufacturer had brought a successful patent challenge (or launched during the pendency of the patent litigation, sometimes referred to as launching "at risk"), it could have launched a generic version of TDF as early as 2009. Even in the best of circumstances for Gilead, the Orange Book-listed patents for Viread expired by January 2018.

73.     On or about July 1, 2009, Teva filed a substantially complete ANDA with the FDA to manufacture and sell a generic formulation of Viread 300mg tablets it had developed. The 300mg strength of Viread constituted the lion's share of all Viread sales.  (Aurobindo was the first to file an ANDA for the 150, 200 and 250 mg strengths.  Aurobindo received FDA approval to market those strengths on January 18, 2018.)

74.     Teva's ANDA included a Paragraph IV certification as to all four TDF patents, *i.e.*, a declaration by the ANDA filer that the patents were either invalid or not infringed by the proposed ANDA product. Gilead initiated Hatch-Waxman patent litigation against Teva by filing a patent infringement lawsuit within forty-five (45) days. Gilead's filing of the lawsuit triggered a stay preventing the FDA from approving Teva's ANDA until the earlier of thirty (30)

19

months has elapsed or the issuance of a "court decision" finding the patents at issue invalid or not infringed by the ANDA drug.

75.     Teva's ANDA, as the first-filed ANDA with a paragraph IV certification for the 300 mg strength, entitled Teva to lucrative 180-day Hatch-Waxman exclusivity.  The "vast majority" of generic drug profits occur during the 180-day exclusivity period.

76.     As set forth in the Hatch-Waxman Act, the 180-day exclusivity commences upon a "first commercial marketing" by the 180-day exclusivity holder or upon a "court decision" finding the patents invalid, unenforceable, or not infringed.

77.     Knowing its patents were weak and likely to be invalidated, Gilead filed baseless patent infringement litigation against nearly each and every generic challenger of the TDF Patents.  Gilead subsequently entered into settlement agreements with nearly each and every challenger before issuance of a final court decision rendering the TDF Patents invalid and/or not infringed. Gilead's goal was simple: to delay generic competition for its billion dollar a year blockbuster drug as long as possible.

78.     Shortly after Gilead's Viread TDF patents expired in January 2018, at least eight ANDAs for 300 mg Viread were finally approved by the FDA.  Many had received tentative approval years earlier.

79.     Gilead's paragraph IV patent litigation against Teva was captioned *Gilead Sciences, Inc. v. Teva Pharmaceuticals USA Inc.*, No. 1:10-cv-1796 (S.D.N.Y. filed March 5, 2010).

80.     The issue presented was a relatively simple obviousness patent analysis. As characterized by Teva in its pretrial memorandum:

> This is a straightforward obviousness case. Three of the patents in suit are directed to a prodrug of the known drug tenofovir (PMPA). The prior art made clear that PMPA is a highly potent anti-HIV drug with poor oral bioavailability. The prior art also disclosed improving PMPA's bioavailability by making a prodrug of it. The particular prodrug disclosed in the prior art, called bis(POM)PMPA, was known to exhibit a manageable but undesirable side effect, whose cause was well understood.

20

*The person of ordinary skill in the art ("POSA") would therefore have sought an alternative prodrug form* that would not exhibit that side effect, and would have selected the carbonate prodrug (bis(POC)PMPA) claimed in three of the patents in suit.

The fourth patent relates to a fumarate salt of the bis(POC)PMPA prodrug claimed in the other three patents. As in *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1362 (Fed. Cir. 2007), the prior art disclosed salts of bis(POC)PMPA and identified a motivation to make others, including the fumarate salt. Just as in *Pfizer v. Apotex*, the *selection of the fumarate salt from the limited number of available pharmaceutically acceptable salts would have been routine*.

*Gilead v. Teva*, No. 1:10-cv-1796 (Dkt. No. 112, at 1 (filed Jan. 28, 2013)) (emphasis added).

81.     The court set a bench trial for February 20, 2013. Teva had agreed not to launch at risk until June 1, 2013. Accordingly, Teva could have launched its generic at any point if the court found Gilead's patents invalid, not infringed, or unenforceable, or on June 1, 2013, if the court had not issued its judgment.

82.     An outcome in Teva's favor would have been devastating to Gilead, costing the company billions of dollars in Viread revenues and profits. And Teva had a decided litigation advantage given the weakness of Gilead's patents.

83.     The day before trial, February 19, 2013, the parties notified the court they had reached a settlement in principle. Gilead's announcement – issued the same day – stated that the settlement resolved Gilead's claims as to the TDF Patents not only for Viread, but also for Gilead's Truvada and Atripla products.  In other words, Gilead's settlement with Teva extended far beyond the specific TDF Patent dispute then being litigated, successfully delaying, impairing and/or suppressing potential generic competition for three of its blockbuster HIV drugs in one fell swoop.

84.     Under the terms of the settlement, Teva would be allowed to launch generic Viread on December 15, 2017, more than 4½ years later and only one and a half months prior to expiration of Viread's Orange Book-listed patents.  Gilead thus bought itself another 4½ years of exclusivity and supracompetitive pricing and profits for Viread.

COMPLAINT AND DEMAND FOR JURY TRIAL

85.     Pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("the Medicare Modernization Act"), the parties to such patent litigation settlements are required to disclosed the terms of the settlements to the FTC and the U.S. Department of Justice ("US DOJ"), which are afforded forty-five (45) days to review the terms of such settlements.

86.     On or about June 28, 2013, the FTC sent Gilead and Teva a letter objecting to and/or expressing concerns relating to the terms of the settlement agreement, which prompted the parties to request that the court extend the automatic dismissal deadline for the case.  *See Gilead v. Teva*, No. 1:10cv1796 (Dkt. No. 132 (filed June 28, 2013)).

87.     As a result, the Court ordered a telephonic status conference for August 29, 2013. At the status conference, which was transcribed but originally redacted in certain relevant places, the parties described the FTC's objection to the court in response to the court's question about the "offending provision" of the agreement:

> **THE COURT**: OK. That sounds pretty good. Maybe the upside is I don't have to do a darn thing. All right. Do you mind my asking what is the offending provision?
>
> **[GILEAD COUNSEL OF RECORD]**: Not at all, your Honor. Just a little bit of background, if I may. The Federal Trade Commission has historically taken issue with settlements between brand companies and generics when those settlements have what are called reverse payments in them where the brand name company pays a sum of money to the generic company, allegedly in exchange for the generic company's agreement to stay off the market longer than the generic company might have otherwise done so.
>
> Not too long ago, as your Honor may be aware, the Supreme Court addressed such provisions in a very split court five-three and they found that . . . such provisions could potentially violate antitrust laws that had to be evaluated under the rule of reason. That has emboldened the FTC and has breathed new life into its enforcement efforts.
>
> So now they have reached out in our agreement, and, as I understand it, in some others, to challenge the agreements even though there is no reverse payment provision. No money was to change hands under our agreement. ***There was, however, a***

22

> *provision in which Gilead agreed that if it were to independently*
> *and unilaterally determine that it would launch a generic, an*
> *authorized generic of its own, it would do so but only if it gave*
> *Teva six weeks head start on the Gilead authorized generic. This*
> *so-called, in the FTC's view, "no authorized generic clause,"*
> *they have now tried to analogize, in our case and others, to a*
> *reverse payment.* That song, quite frankly, has never had too
> many folks singing in its choir.

*Gilead v. Teva*, No. 1:10-cv-1796 (Dkt. No. 134, at 4:17-5:21 (Aug. 29, 2013)) (emphasis added).

88.     Since the August 29, 2013 hearing, numerous courts have agreed with the Federal Trade Commission and found that "no authorized generic" clauses can and indeed do constitute anticompetitive reverse payments to ANDA filers.

89.     Gilead's counsel continued by assuring the Court that the parties had simply removed the "no authorized generic" agreement from the settlement:

> **[GILEAD COUNSEL OF RECORD]:** … as of late yesterday
> afternoon, the parties have determined that they will drop the
> "offending" provision from the agreement. So we simply now
> have to prepare and execute a simple amendment to the underlying
> settlement agreement, send that down to the Federal Trade
> Commission, and then your Honor will be able to dismiss the case.
>
> …
>
> **[GILEAD COUNSEL OF RECORD]:** … Fortunately, for all
> concerned, we have resolved it, but we have eliminated the so-
> called "no AG clause" from the agreement so it is truly
> inconceivable to us that the Federal Trade Commission can have
> any other complaints …."

*Id*. at 3:23-4:3 & 6:5-9.

90.     It is noteworthy that Gilead's counsel said that the "no AG" language was being removed from the agreement, but not that Gilead and Teva no longer had an agreement preventing Gilead from launching an AG for six weeks.  Nor did Gilead's counsel represent that the parties had agreed to any other changes in the agreement to reflect the supposed elimination of the no-AG provision.

91.     The above-reproduced language disclosing the existence of a no-AG agreement was and is redacted in several versions of this transcript.

23

COMPLAINT AND DEMAND FOR JURY TRIAL

92.     As counsel for Gilead and Teva represented to the court, the no-AG clause was simply dropped from the patent settlement agreement and no other changes were made to the settlement agreement, including specifically to the negotiated generic entry date of December 15, 2017.  That is, Gilead and Teva simply dropped the no AG clause from the formal patent settlement agreement to avoid Federal Trade Commission scrutiny, but continued to honor the clause in purpose and effect, as evidenced by, among other things, Gilead's failure to launch an AG version of Viread to compete with Teva's generic.

93.     The economics of the generic exclusivity period for a blockbuster drug like Viread and of competing authorized generics make this purported scenario highly implausible. According to the FTC, in a scenario without a competing authorized generic, the first filer generic immediately gains a substantial share of within days of launch, and ultimately will capture up to 90% of the total molecule market. The greater the market share the first filer is able to secure, the greater the long term advantages, as the first filer usually retains the majority of its exclusive market share even with the presence of multiple generics.

94.     Applying these observed market dynamics to this case, Gilead earned annual revenues on Viread of approximately $1 billion before the launch of generic equivalents (or $115 million during the 6- week exclusivity period). Teva, as the first filer, claimed at least half of that revenue during the exclusivity period and retained a significantly higher portion of the overall market even beyond the exclusivity period.  In such a situation, Teva could expect revenues over $50 million during the 6-week exclusivity period without a competing AG.

95.     Teva's profits would have been significantly lower had Gilead launched a competing authorized generic. According to the Federal Trade Commission, in that event, Teva would obtain only approximately 30% of the market during the 6-week exclusivity period. And, Teva's market share would not have increased much higher thereafter.

96.     Greater price erosion also cuts into the first filer's revenues. In the above $1 billion drug example, instead of launching at a 10% discount to the brand and making over $50 million in revenues during the 6-week exclusivity period, the first filer must launch at a greater

COMPLAINT AND DEMAND FOR JURY TRIAL

discount to compete with the authorized generic. Assuming Teva launched at a 25% discount to the brand and maintained an average 30% market share during the 6-week exclusivity period, Teva would only earn revenues of approximately $28 million during the 6-week exclusivity period. Gilead's launch of an AG would thus cost Teva over $20 million in revenues during the 6-week exclusivity period, and additional hundreds of millions of dollars beyond the exclusivity period as Teva's market share would not recover.

97.     It is inconceivable that Teva provided Gilead with close to its best possible litigation outcome with regards to the negotiated generic entry date (only 1 month prior to patent expiry), and also agreed to simply drop the most important provision of the settlement agreement, worth millions of dollars to Teva, without any other changes to the terms of the parties' agreement.

98.     The existence of a no-AG agreement is further supported by Teva's press release announcing its "exclusive" generic Viread launch.  Although the "no AG agreement" language was excised from the settlement agreement itself, the existence of such an agreement between Gilead and Teva continued and was indeed honored by Gilead when it did not launch a competing AG in December 2017.

99.     Gilead's decision not to launch a competing AG defies rational business logic, as such a move could have offset the expected generic erosion. Moreover, a "no AG agreement" runs contrary to Gilead's decision to recognize such profits and launch AGs with respect to multiple other products in its portfolio, including its blockbuster hepatitis C drugs Harvoni and Epclusa, through its subsidiary Asegua Therapeutics.  Yet, Gilead never launched a Viread AG.

100.     The purpose of the settlement agreement was clear: in exchange for delayed generic entry, Teva would be granted exclusive entry into the market without competition from a Gilead AG.

101.     Indeed, when Teva finally did launch its generic Truvada (and generic Atripla) equivalents, it quickly began to capture market share.

COMPLAINT AND DEMAND FOR JURY TRIAL

102.     To ensure Teva's exclusivity, Gilead included "most-favored entry" ("MFE") and "most-favored-entry-plus" ("MFEP") provisions in its patent settlements with Teva and other generic manufacturers.  Specifically, Gilead used MFE clauses to entice Teva to delay entry of its generic version of Viread until December 2017 in return for assurances that no other generic manufacturer would enter the Viread/TDF market before Teva. Such agreements provided Gilead control over when generic entry would occur and allowed it to place a thumb on the scale of competition in the TDF market. Having information as to the timing of generic TDF was also essential to Gilead's multi-layered product-hopping schemes and compounded the anti-competitive effects of Defendants' concerted plans to delay and suppress generic competition in the markets for these critical HIV drugs.

103.     Agreements with MFE clauses primarily benefit first filers. MFE clauses arise when the brand manufacturer and the first generic ANDA filer settle patent infringement litigation, with the generic manufacturer agreeing to delay entering the market until a certain specified date in the future. MFE clauses provide that if any subsequent generic ANDA filer (second and subsequent filers) succeeds in entering the market before the agreed upon date for the first filer, the first filer's entrance will be accelerated and it may enter at the same time as that subsequent filer.  Given the effect of competition from a second entrant, MFEs can delay generic entry by reducing a second filer's incentive to try to enter the market before the first filer.  In other words, if second filers are aware that they will face immediate competition from a first filer, the second filer is less likely to pursue costly patent infringement litigation against the brand company.  Two entrants inevitably means reduced market share and lower pricing for both generics.

104.     An MFEP provides that the brand manufacturer will not grant a license to any second filer to enter the market until a defined period of time after the first filer enters. For example, MFEP clauses may provide that a brand manufacturer will not grant a license to any second filer(s) to enter the market for a specified period of time following entry of the first filer. Like MFE clauses, MFEP clauses dramatically reduce a second filer's incentive to try to enter

COMPLAINT AND DEMAND FOR JURY TRIAL

the market before the first filer, because they ensure the first filer's exclusivity for a set period of time.

105.     Absent an MFEP, a second filer could use its challenge to the patents as leverage to negotiate with the brand manufacturer for a license to enter the market before the first filer. This is particularly significant where the first filer has forfeited its 180-day exclusivity by failing to get tentative FDA approval within 30 months. Absent the 180-day exclusivity period, the second filer could enjoy a substantial period of de facto exclusivity in the generic sector of the market. The MFEP would eliminate that possibility by ensuring that the second filer could not successfully negotiate for an earlier licensed entry date.

106.     In short, the Hatch-Waxman Amendments leave open at least two pathways for second filers to enter the market before a first filer that has agreed to delay entry into the market. The second filer could win the patent litigation and trigger forfeiture of the first filer's statutory exclusivity when the first filer fails to enter the market within 75 days of the court decision; or the second filer could negotiate an earlier entry date from the brand manufacturer and enter the market if the first filer has forfeited statutory exclusivity by having failed to get FDA approval within 30 months.  Using MFE and MFEP clauses can prevent a second filer from successfully using the two pathways to earlier generic entry that Congress left open. This is particularly troubling here, where legislative intent clearly calls for expedited review and approval of critical antiretroviral medications for the treatment of HIV and where challenging weak patents could bring such products to the market more quickly.

107.     The anticompetitive effects of MFEs and MFEPs may be compounded by increasing the number of generic manufacturers to which the clauses apply. When a second filer is deciding whether to initiate or continue a patent challenge, knowing that the brand manufacturer has already granted an MFE to the first filer and has offered to grant one to the second filer, it is reasonable to conclude that the brand manufacturer will also likely grant one to subsequent filers (*i.e.* the third, fourth, fifth, and sixth filers).

COMPLAINT AND DEMAND FOR JURY TRIAL

108.    In these circumstances, the second filer faces the prospect that, even if it expends substantial resources to win the patent case, its "victory" would trigger simultaneous entry into the market by the first filer, possibly an "authorized generic" marketed by the brand manufacturer, and possibly additional generics.  Simultaneous entry of multiple manufacturers would quickly compete prices down close to marginal cost.

109.    MFEs and MFEPs can thus be used to prevent or significantly deter another generic manufacturer from profitably using its patent challenge to get earlier entry than the first filer. In short, MFEs and MFEPs often deter second filers from pursuing earlier entry and reducing costs of the product.

110.    Gilead used MFEs and MFEPs to delay the onset of generic competition for Viread and standalone generic TDF. The agreements set a date for initial generic entry and provided that the first filer, Teva, could enter sooner should a second filer gain entry into the market by, for example, proving the TDF patents invalid and/or not infringed. The MFEP clauses compounded the anticompetitive effects of these provisions by providing that Gilead would not authorize further generic entry for a defined period after the initial entry. These anticompetitive clauses proved to be effective tools for Gilead. All generic manufacturers agreed to stay out of the market during the period of exclusivity that Gilead granted to Teva in the MFEP, and, in exchange, Teva agreed to delay entry into the market until December 15, 2017.

111.    From March 2010 to February 2013, six more generic drug manufacturers—Lupin, Cipla, Hetero, Aurobindo, Strides Pharma, and Macleods Pharmaceuticals—filed ANDAs seeking FDA approval to sell generic Viread. The first two of those six manufacturers included Paragraph IV certifications with respect to the TDF Patents. Gilead and Teva fully understood that the other four of those six intended to enter the market as soon as possible and would amend their ANDAs to include Paragraph IV certifications (as is common in the industry) if it appeared that they had an opportunity for a period of *de facto* exclusivity.

112.    These competitors posed a significant threat to Teva. Absent the MFEs and MFEPs, the forfeiture provisions created the prospect that, if Teva agreed to a long entry delay,

28

a second filer would: (a) obtain a judgment of invalidity or non-infringement and enter the market years before Teva; or (b) use the leverage of its patent challenge to negotiate an earlier licensed-entry date from Gilead in the event that Teva forfeited its exclusivity. Without MFE and MFEP clauses, Teva faced a substantial risk that it would be stuck on the sidelines while second filers beat it to the market and reaped the corresponding gains of being the first generic TDF standalones.

113.    Gilead enticed Teva to enter into the settlement for Viread in part by using MFE and MFEP clauses to forestall additional generic competition until after Teva entered the market. This reduction in generic competition was enormously valuable to Teva. For every week that Teva was on the market as the only generic manufacturer of a standalone TDF/Viread generic, it could expect to sell all of the TDF units at about 90% of the brand price. Entry of multiple generics would swiftly cause Teva's unit sales and profits per unit sale to decrease.

114.    When Teva exclusively entered the Viread market in December of 2017, it expected to earn substantially greater sales than if it had entered with up to seven other generics on day one. Gilead's efforts to forestall generic competition increased Teva's sales by millions of dollars every week in which it was the only generic Viread seller. Moreover, Teva's competitive advantage was not limited to just the period when no other manufacturer was selling the product. With a date certain, single-entrant launch date, Teva could ramp up its production and negotiate contracts with its customers to effectively flood the distribution channel with product before the second filers entered the market, and lock in high prices with long-term sales contracts. The difference between the single-generic price and the price with multiple generic competitors represented a significant additional cost to purchasers of the drug.

115.    In order to delay entry of generic TDF, Gilead included MFE clauses in all of its settlement agreements with Teva and other generic Viread manufacturers. Those MFE clauses persuaded Teva to agree to delay entry, and they prompted all of the subsequent filers to agree to delay entry until at least six weeks after Teva's entrance into Viread market.

29

COMPLAINT AND DEMAND FOR JURY TRIAL

116.     The first MFE appeared in a November 27, 2012 interim agreement between Gilead and Teva.  Teva agreed that it would not enter the market with Viread or Truvada while the TDF patent litigation was pending, until the earlier of (i) various events in the patent litigation (e.g., a finding of invalidity), or (ii) a second filer entered the market. Gilead and Teva put this MFE in the public record, so all of the second filers knew that any final agreement between Gilead and Teva very likely included an MFE.

117.     In February 2013, Gilead and Teva agreed in principle to settle their litigation over the TDF patents, and they finalized the agreement in April 2013. Under the agreement, Teva agreed to delay marketing generic Viread and any other TDF-based HIV medication until December 15, 2017.

118.     The MFEs allowed Gilead to extract an exceedingly favorable entry date—just six weeks before the end of the patent term in mid-January 2018.  The MFE provided that, if any second filer entered the market before December 15, 2017, Teva's entry date would be moved up accordingly. The MFEPs further provided that Gilead would not grant any other manufacturer a license to enter the market with generic TDF until at least six weeks after Teva's agreed entry date. This also provided Teva with an important head start in securing contracts and establishing manufacturing and distribution for standalone TDF, especially given the fact that Gilead was at the time marketing several other TDF-based HIV medications.

119.     The MFE allowed Gilead to obtain a later entry date than Teva otherwise would have agreed to. Without the clauses, Teva faced the prospect of simultaneous entry by as many as six other generic manufacturers. With the clauses, Teva was nearly guaranteed that no generic manufacturer would enter before it and that it would have the market to itself for at least six weeks.

120.     When agreeing to the delayed December 15, 2017 entry date, Teva knew that: (1) Gilead was willing to include anticompetitive MFEs in settlement agreements with subsequent filers; (2) it was in Gilead's financial interest to include such clauses in agreements with all subsequent filers; (3) the subsequent filers knew that the Gilead/Teva agreement

30

COMPLAINT AND DEMAND FOR JURY TRIAL

included an MFE; (4) no subsequent filer after the adoption of the MFEs would have an interest

in incurring the costs of patent litigation to try to enter the market before Teva; and (5) the

MFEs' deterrent effect would grow with every additional MFE that Gilead granted in settlement.

121.    Subsequent filers were aware of the MFEs in the Gilead/Teva agreement.

122.    The MFEs protected Teva from competition from any other generic

manufacturer until the end of the TDF Patent terms on January 26, 2018—six weeks after Teva

entered.

123.    By the time that Gilead and Teva finalized their agreement in April 2013, Gilead

had filed patent infringement lawsuits against Lupin and Cipla, both of which had provided

Paragraph IV certifications with respect to the TDF Patents. In July of 2014, Gilead settled its

litigations with Cipla, with respect to the patents covering Viread (TDF) and the patents

covering Emtriva (FTC). Under the settlement, Cipla agreed not to launch generic Viread until

six weeks after Teva launched.

124.    Just as Gilead intended, the MFEs in the Teva agreement, and the MFEs in the

Cipla agreement, caused the other ANDA filers—Hetero, Aurobindo, Strides, and Macleods—

not to amend their ANDAs to include Paragraph IV certifications. Absent Gilead's

anticompetitive conduct, at least Hetero and Aurobindo would have made such certifications as

they made Paragraph IV certifications with respect to Truvada.

125.    On January 26, 2018, six weeks to the day after Teva entered the market, five

additional generic manufacturers (Cipla, Hetero, Aurobindo, Strides, and Macleods) received

final FDA approval, and four immediately began marketing generic Viread.  This belated

competition was possible because Teva had forfeited its 180-day exclusivity.

126.    Gilead enticed Teva to delay its launch of generic Viread by using MFE and

MFEP clauses to forestall generic competition after Teva entered the market.  This suppression

of generic competition was enormously valuable to Teva and amounted to a payment.

127.    In 2017, the year that Teva eventually entered the market, Viread had U.S. sales

of $591 million, or about $11 million per week.  Generic manufacturers (however many there

COMPLAINT AND DEMAND FOR JURY TRIAL

were) could expect to take at least 80% of Viread's unit sales.  As the sole generic on the market Teva could expect to price its generic at 90% of the brand price and make at least $7.9 million for every week of sales, while as one of seven generics on the market Teva could expect to price its generic at about 20% of the brand price and make a seventh of the total generic sales or about $250,000 for every week of sales.  Thus, Gilead's and Teva's efforts to forestall generic competition increased Teva's sales by $7.65 million for every week in which it was the only seller of generic Viread—an increase of $45.9 million over the six weeks secured by the MFEs and MFEPs.

128.    During the six weeks secured by the MFEs and MFEPs, Teva was the only seller of generic Viread on the market, and it stuffed the supply chain with its generic Viread product, locking in high prices through long-term sales contracts. Thus, Teva made millions more than it would have absent the MFEs and MFEPs. Absent Defendants' anticompetitive conduct, Teva and the second filers would have entered the market much sooner than they did. The delay in generic entry protected more than $2 billion in Gilead's Viread branded sales, all at the expense of Plaintiffs and other purchasers of the drug.

129.    The delay of generic Viread and standalone TDF allowed Gilead to reap substantial sales and profits and further incented Gilead to delay development of its TAF-based line, as discussed below. By unfairly suppressing competition for TDF and acting to protect its profits from the sale of TDF as a component of FDC HIV medications like Truvada and Atripla, Gilead was able to maintain profits without innovating and rolling out safer and more effective TAF.  Gilead withheld TAF-based HIV medications from the market until the entry of generic TDF was imminent. In the interim, Gilead launched multi-layered schemes to stall generic competition and maximize profits for its TDF-based drugs to the detriment of purchasers of those drugs.

**B.    Reverse-Payment Agreements: Truvada and Atripla**

130.    Shortly after Defendants' Viread patent settlement agreements, Gilead entered into similar anticompetitive settlement agreements with Teva to delay the entry of lower-cost

COMPLAINT AND DEMAND FOR JURY TRIAL

generic Truvada and Atripla. These agreements were highly effective impediments to generic competition.  Until recently, Teva marketed the only generic versions of both drugs.  Additional generic manufacturers recently entered both markets, causing prices of generic Truvada and Atripla to plummet.

131.    As in the case of Viread, generic erosion of Truvada and Atripla sales would have occurred swiftly.  Introduction of generic Truvada and Atripla would have drastically reduced pricing and made these crucial HIV medications more affordable and accessible to those living with HIV.  Moreover, reduced pricing of Truvada for PrEP would have greatly benefited efforts to end the public health AIDS/HIV epidemic. Defendants' unlawful efforts to delay generic Truvada and Atripla substantially harmed purchasers of those drugs.

132.    Truvada is a fixed dose combination antiretroviral medication combining two previously approved HIV medications in a single pill: 300mg TDF and 200mg FTC. Currently, Truvada is one of only two FDA approved drugs for PrEP, the most effective method of preventing HIV infection in HIV-negative individuals.

133.    Gilead submitted its Truvada NDA as a "priority" submission of "Type 4 – New Combination" in late March 2004, and it was approved by the FDA a few months later on August 2, 2004 for use in combination antiretroviral treatments for HIV-1 infection in adults.

134.    Unlike typical NDA submissions, which require lengthy and costly clinical trials, investigation and research, Gilead's Truvada NDA was approved based on a showing that Truvada was bioequivalent to the combination of its separate components (TDF and FTC). This is largely because Truvada is a simple combination of previously FDA approved medications that have already been shown to be safe and effective.  Gilead's NDA approval for Truvada relied on a single pharmacokinetic study, a previously submitted drug-drug interaction study and dissolution data, akin to the abbreviated approval process and requirements for generic manufacturers to market versions of branded products.

135.    Truvada quickly became a blockbuster drug and has been one of Gilead's top selling HIV products, historically accounting for approximately one-quarter of its HIV sales and

COMPLAINT AND DEMAND FOR JURY TRIAL

almost 12% of its total sales. Within two years of its launch in 2004, Truvada became a billion-dollar earner for Gilead.

136.     In 2012, the FDA approved Truvada for PrEP indication. Following the new 2012 guidelines and the expansion of Truvada for PrEP, Truvada sales skyrocketed. In 2016, there were 77,120 PrEP users in the U.S. compared to just over 8,000 in 2012.  Gilead acknowledges this increase.  It explained that the increase in 2016 Truvada sales was "primarily due to higher average net selling price and higher sales volume in the U.S., as a result of the increased usage of Truvada for PrEP."  Without generic competition in the U.S. market until only recently, Gilead has been able to raise prices year after year, consistently earning in excess of $2 billion annually for Truvada sales.

137.     Atripla is an FDC antiretroviral medication combining three previously approved and manufactured HIV medications in a single pill: 300mg TDF, 200mg FTC and 600mg EFV.

138.     Atripla was approved on July 12, 2006, roughly two years after Truvada, for use alone or in combination antiretroviral treatment of HIV-1 infection in adults. As in the case of Truvada, Gilead was not required to conduct lengthy clinical trials and investigations to support its Atripla NDA, because the three components (TDF, FTC and EFV) had previously been tested and proven safe and effective on their own. For approval of its Atripla NDA, Gilead merely had to conduct bioequivalence testing. Approximately three months after Gilead's initial submission, the FDA approved Atripla largely based on the same requirements that a generic must satisfy in an ANDA review.

139.     Like Truvada, Atripla became a top earner for Gilead.  Within two years of its approval in 2006, sales reached approximately $1.5 billion.  For a decade thereafter, and without generic competition in the U.S. market until only recently, Atripla sales have consistently been at or above $1 billion.  Like Truvada and Viread, Atripla has been a significant source of revenue for Gilead.

COMPLAINT AND DEMAND FOR JURY TRIAL

140.     Gilead's TDF and FTC patent portfolios consist of weak, evergreened and ancillary patents and heavily rely on prior innovations. None of the API components in Truvada (TDF/FTC) or Atripla (TDF/FTC/EFV) are new or novel. Each was discovered decades before any of Gilead's patent applications and had been marketed in the U.S. as a branded product for years at the time of the applications.

141.     The Orange Book listed patents for Truvada and Atripla covering the FTC component include the 6,642,245 ("the '245 patent") and 6,703,396 ("the '396 patent") (collectively "the FTC Patents"). Truvada and Atripla were also covered by the TDF Patents (the '695 patent, the '089 patent, the '230 patent, and the '946 patent), which expired in January of 2018. As discussed below, the third component in Atripla, EFV, was covered by BMS patents, which expired in July and August of 2018.

142.     In addition to patents covering the components of Truvada and Atripla, Gilead sought and obtained treatment and formulation patents for the combination products in order to stave off generic competition. These later-listed Orange Book patents were obvious and not novel.  They issued after Gilead began filing baseless patent infringement cases against potential generic rivals, do not cover the API but rather cover "method of use," "dosing," and/or "formulation," are considered weak and ancillary and would have likely been found invalid. These patents include U.S. Patent Nos. 8,592,397 ("the '397 patent"), 8,716,264 ("the '264 patent"), and 9,457,036 ("the '036 patent") (collectively "Later-Listed Atripla Patents").

143.     The patents allegedly protecting the Truvada and Atripla single-pill combinations are not innovative, novel or new. Simply combining drugs in fixed-dosage form would have been obvious to a person skilled in the art at the time of development of Truvada and Atripla. To extend its flagship TDF-based HIV top sales earners, Gilead obtained these patents of dubious validity, filed weak patent lawsuits against any potential generic rivals and switched the market to Truvada and Atripla in order to suppress competition.

144.     In lieu of innovating itself, Gilead acquired the majority of the core intellectual property allegedly protecting Truvada and Atripla by obtaining exclusive licenses and

COMPLAINT AND DEMAND FOR JURY TRIAL

assignments from others. From 2004 to 2017, Gilead made tens of billions of dollars from HIV medications while introducing only a single new pharmaceutical compound.

145.    As noted above, Tenofovir, was not invented by Gilead but by Czech institutions in the 1980's.  In 2000, in anticipation of launching Viread, Gilead amended its agreement with the Czech institutions and inventors of tenofovir to reduce future royalty rates for tenofovir containing products. In 2004 in anticipation of its introduction of Truvada and Atripla, Gilead again amended the agreements with the inventors of tenofovir to include Truvada and any future fixed-dose combination products that contain the licensed technology. At the same time, the Czech institutions, understanding the need for accessible and affordable medications to end the HIV epidemic, agreed to waive any right to royalty payments for Viread or Truvada in developing countries where products are sold at or near cost.

146.    The substantial contributions of Emory University to the development of FTC for HIV treatment are acknowledged in the name of Gilead's branded standalone FTC, Emtriva. The "Em" in "Emtriva" stands for Emory University.

147.    Most of the research and development of FTC as an effective treatment for HIV was done prior to Gilead obtaining its '245 and '396 patents. Acquiring Emory's patent rights and research allowed Gilead to rush standalone FTC and Truvada to the market on an extremely expedited timeline. The FDA approved standalone FTC in July 2003, roughly six months after Gilead acquired an exclusive license to FTC. In March of 2004, less than a year later, Gilead filed its NDA for Truvada, which the FDA approved in August of 2004 (just four months after Gilead's initial submission).

148.    The NCE exclusivities for Truvada and Atripla expired on July 2, 2008.  As a result, any 30-month stay blocking FDA approval of a competing generic could have expired as early as January 2, 2011.  That means that a generic manufacturer bringing a successful patent challenge against Truvada or Atripla could have launched a generic version of Truvada or Atripla as early as 2011. Even in the best of circumstances for Gilead, the Orange Book listed

36

COMPLAINT AND DEMAND FOR JURY TRIAL

patents were to expire by their own terms in January of 2018 for TDF and in September of 2021 for FTC.

149.     On or about September 26, 2008, Teva filed substantially complete ANDAs with the FDA to manufacture and sell generic formulations of Truvada and Atripla.

150.     Teva's Truvada ANDA included a paragraph IV certification as to the FTC Patents.  It asserted that the patents were either invalid or not infringed by its proposed Truvada ANDA product. The FTC Patents were set to expire on May 4, 2021 and September 9, 2021.

151.     Teva's Atripla ANDA also included a paragraph IV certification as to Gilead's FTC Patents as well as its four TDF Patents and certain patents that BMS claimed covered EFV (described in more detail below).  It asserted that the patents were either invalid, unenforceable or not infringed by Teva's proposed Atripla ANDA product.

152.     Like Teva's ANDA for Viread, Teva's ANDAs for Truvada and Atripla were each the first substantially complete applications to be filed, entitling Teva to statutory ANDA exclusivity. As set forth in the Hatch-Waxman Act, the 180-day exclusivity commences upon a "first commercial marketing" by the first filer ANDA holder or upon a "court decision" finding the patents invalid, unenforceable, or not infringed.

153.     Gilead filed patent infringement lawsuits within forty-five (45) days of receiving Teva's paragraph IV certifications.  Gilead's filing of the lawsuit triggered a stay preventing the FDA from approving Teva's ANDAs for Truvada and Atripla until the earlier of thirty (30) months or the issuance of a court decision finding the patents at issue invalid or not infringed.

154.     Gilead filed suit against Teva on December 12, 2008, alleging its generic Truvada would infringe Gilead's FTC Patents. On September 25, 2009, Gilead amended its patent infringement complaint, adding allegations that Teva's generic Atripla would also infringe its FTC Patents. The cases were consolidated and patent infringement issues relating to the FTC patents were litigated in the consolidated action captioned *Gilead Sciences, Inc., et al. v. Teva Pharms.*, Case No. 08-cv-10838 (S.D.N.Y.).

155.     Gilead filed its Truvada and Atripla patent infringement lawsuits without regard to the merits of those cases.  It knew that its patents were weak, fully anticipated that generic manufacturer(s) would successfully challenge its patent claims, and expected to face imminent generic competition. When it sued Teva in December of 2008, Gilead knew there was a substantial probability that it would lose the patent infringement litigation because of the weakness of its patents.  As reported in Gilead's 2008 SEC Form 10-K:

> Teva alleges that two of the patents associated with emtricitabine, owned by Emory University and licensed exclusively to [Gilead], are invalid, unenforceable and/or will not be infringed by Teva's manufacture, use or sale of a generic version of Truvada. In December 2008, we filed a lawsuit in U.S. District Court in New York against Teva for infringement of the two emtricitabine patents. We cannot predict the ultimate outcome of the action, and we may spend significant resources defending these patents. If we are unsuccessful in the lawsuit, some or all of our original claims in the patents may be narrowed or invalidated, and the patent protection for Truvada in the United States would be shortened to expire in 2017 instead of 2021.

156.     Following various amendments and pretrial proceedings in Gilead's patent litigation against Teva, only the FTC patents were left for trial.

157.     The trial began on October 8, 2013 and concluded on October 28, 2013.  It focused on one of Teva's strongest contentions: that the patents were invalid for obviousness-type double patenting because the (-)-enantiomer "species" patents were anticipated by earlier expiring "genus" patents, which claimed all enantiomeric forms of the FTC compound, and that the claimed (-)-enantiomer was disclosed as part of the genus patents' claims.

158.     More specifically, Teva asserted that Gilead's Orange Book-listed FTC Patents, which it licensed from Emory, were invalid and an improper attempt to extend Gilead's monopoly beyond the scope of previously issued patents. As explained in Teva's Pre-Trial Memorandum, Gilead was trying to parlay Emory's earlier invention and associated patent rights into additional patents (and exclusivities) for uses that were not novel or new and would have been obvious to person skilled in the art at the time. The claims disclosed in Emory's initial FTC patents (the '639 and '085 patents) relating to the discovery of FTC for HIV treatment

38

rendered Gilead's later-obtained FTC Patents (the '245 and '396 patents) invalid as obvious and/or anticipated:

> What is relevant is that [Gilead et al.] are entitled only to a single patent term for emtricitabine, irrespective of the value or properties of that drug. Plaintiffs received the complete protection the law allows when they received the '639 and '085 patents, which claim emtricitabine and its only use. [***Gilead et al.***] ***are not entitled to an extra six-year monopoly simply for recycling those patents and again claiming emtricitabine and that use***. Upon the expiration of the '639 and '085 patents, the population that suffers from AIDS is entitled to obtain that drug, and the generic drug industry is entitled to offer it to that population, at a non-monopoly price. That is the promise of the Hatch-Waxman Act, Congress's expression of the public policy that favors the introduction and distribution of generic drugs not protected by valid patents.

Defendants' Memorandum in Opposition to Plaintiffs' Pre-trial Memorandum in *Gilead Sciences, Inc., et al. v. Teva Pharmaceuticals USA, Inc.*, et al., Case No. 08-cv-10838 (RJS) (S.D.N.Y.), Dkt. 152 (Sept. 23, 2013)) (emphasis added).

159.   Other generic manufacturers, well aware of the inherent weaknesses of Gilead's patents, similarly challenged Gilead's Truvada and Atripla patents. In response, Gilead filed lawsuits against nearly each and every potential generic rival, alleging infringement of its duplicitous and ancillary patent portfolios.

160.   The FDA gave final approval to Teva's Truvada ANDA on June 8, 2017. To date, eight other ANDA filers have received final approval to launch generic Truvada and have done so.  The FDA approved Teva's Atripla ANDA on November 9, 2018, and at least three other ANDA filers have received final approval to launch a generic version of Atripla.

161.   Gilead and Teva settled the FTC Patent case in February of 2014 while awaiting the trial court's decision. Notably, Defendants' settlement of the FTC patent infringement case came shortly after their settlement in mid-2013 of the TDF Patent infringement litigation as to Viread, Truvada and Atripla and shortly before Gilead's July 2014 settlement with Cipla, which resolved patent litigations involving both FTC and TDF Patents.

39

162.     Having successfully settled the TDF patent case using MFE and MFEP provisions, Gilead and Teva used the same clauses in the FTC case to guarantee a future date certain for Teva's generic entry for Truvada and Atripla in exchange for assurances to Teva that no generic manufacturer would enter the market prior to Teva.

163.     The settlement agreements set a date certain for Teva's initial generic entry and further provided that Teva, as the first filer, could enter sooner should a second filer gain entry into the market by, for example, proving that Gilead patents were invalid.

164.     Gilead's settlement agreements with other generic manufacturers challenging the FTC patents reinforced and compounded the anticompetitive effects of these MFEs by including MFEPs—*i.e.*, promises that Gilead would not authorize further generic entry for a defined period after Teva's initial entry and delaying other generics from entering the market for an additional 6 months after Teva's initial entry.

165.     In sum, Teva agreed to delay its generic versions of Truvada and Atripla for years in exchange for 6 months of exclusivity, free from generic competition. This exclusivity and entry position were of significant value to Teva.

166.     The MFE and MFEP clauses in the Truvada and Atripla settlement agreements were extremely effective at delaying and suppressing generic competition. Each generic manufacturer ultimately agreed to stay out of the market for the period of time that Gilead granted to Teva in the MFEPs, and, in exchange, Teva agreed to delay generic Truvada and Atripla until September 30, 2020, just one year before expiration of the FTC patents.

167.     After Defendants entered into the settlement agreements delaying generic competition for Truvada and Atripla until September 30, 2020, Gilead struck another anticompetitive settlement with Cipla. The settlement agreement with Cipla contained additional anticompetitive provisions, creating another roadblock to generic entry of Truvada and Atripla. Cipla agreed to substantially delay the launch of its generic stand-alone FTC product until August of 2020 (approximately one month before the agreed-upon date certain for generic entry of Truvada and Atripla) in exchange for undisclosed payments and assurances of exclusivities

COMPLAINT AND DEMAND FOR JURY TRIAL

1   with respect to Defendants' HIV medications, despite having received final FDA approval for its
2   generic from the FTC in July of 2018.

3   168.    As discussed below, the delay of generic Truvada and Atripla was crucial to
4   Gilead's collusive collaboration with BMS and provided the time necessary for Gilead to switch
5   prescriptions from TDF-based products to its patent-protected and higher-priced TAF-based
6   products before generic TDF-based products launched.

7   169.    The '396 patent (the later of the two FTC Patents) as extended by pediatric
8   exclusivity does not expire until September 9, 2021. As with Viread, a number of second filers
9   lined up behind first filer Teva challenging Gilead's FTC Patents. At the time of Teva's and
10   Gilead's February 2014 settlement, Gilead had filed multiple patent infringement lawsuits
11   relating to the FTC patents against Cipla, Lupin, Mylan, Aurobindo, Hetero, and Amneal, almost
12   all of which had provided Paragraph IV certifications with respect to Truvada. And Gilead had
13   filed a patent infringement lawsuit against other generic manufacturers, including Lupin, which
14   had provided Paragraph IV certifications with respect to Atripla.

15   170.    Teva and these subsequent filers faced the same economic dynamics as in the
16   case of Viread: the MFEs and MFEPs granted to Teva dissuaded the second filers from
17   continuing to litigate and provided Teva a period of exclusivity. Significantly, at the time of the
18   settlement, Teva had forfeited its 180-day ANDA exclusivity with respect to Truvada, and may
19   have forfeited it with respect to Atripla, by having failed to obtain tentative FDA approval
20   within 30 months of submitting its application.  21 U.S.C. 355 § (j)(5)(D)(i)(I)(aa)(BB).

21   171.    Under the February 2014 settlement agreement, Teva agreed not to launch a
22   generic version of Truvada or Atripla until September 30, 2020.  Gilead was able to extract such
23   a late entry date for generic Truvada and Atripla—one year before patent expiration—because
24   the MFE and MFEP provisions provided Teva with a guarantee that no generic manufacturer
25   would enter before it.

26   172.    The MFEPs provided that Gilead would not grant a license to any other
27   manufacturer to enter the market with generic Truvada or generic Atripla until at least six

28

41

months after Teva's agreed entry date. This was of particular importance to Teva because it had either forfeited its eligibility for the 180-day statutory exclusivity period or at the very least was uncertain of that eligibility.  The MFEs and MFEPs provided Teva with assurances of 180-day exclusivity that it was not entitled to by statute or regulation. Teva traded its delay of generic Truvada and Atripla for the guarantee of 180 days of exclusivity.

173.    The MFEs further provided that, if any subsequent filer entered the market before Teva's agreed entry date, Teva's permitted entry date would be accelerated correspondingly.  No generic manufacturer introduced generic Truvada or Atripla prior to Teva.

174.    Gilead advised subsequent filers of the existence of the MFEs and MFEPs in the Gilead/Teva agreement.

175.    Gilead succeeded in delaying entry of generic Truvada and Atripla just as it did with respect to Viread. Gilead settled the FTC patent litigations with Cipla in May 2014; with Lupin in September 2014; with Mylan in October 2015; with Aurobindo in September 2016; with Hetero in August 2016; and with Amneal in April 2017.  Gilead included an MFE in each of those settlement agreements, and all of the manufacturers agreed to delay entering the market until six months after Teva's entry.

176.    The reduction in generic competition provided by the MFE and MFEP provisions had enormous value to Teva. At the time of settlement in 2014, annual combined U.S. sales for Atripla and Truvada were approximately $4 billion. As the only generic manufacturer of Truvada and/or Atripla, Teva could expect to sell all of its units at about 90% of the brand price. Entry of multiple generics, however, would swiftly deteriorate Teva's unit sales and the profits per sale.  Using the methodology described above in connection with Viread, six months of exclusive sales of those generic products was worth almost $1.5 billion to Teva. Absent the payment to Teva, Teva and subsequent filers would have entered the market sooner than they did.  The delay in generic competition protected billions of dollars in Truvada and Atripla branded sales, all at the expense of Plaintiffs and other purchasers of those drugs.

COMPLAINT AND DEMAND FOR JURY TRIAL

177.    Moreover, Teva's competitive advantage was not limited to its period of exclusivity. With a guaranteed single-entrant launch date, Teva could ramp up its production and negotiate contracts with its customers to flood the distribution channel with generic products before any second filer entered the market and lock in high prices with long-term sales contracts. The difference between the single-generic price and the multiple generic represented a significant cost to purchasers of the drugs.

**C.    The No-Generics Restraints**

**1.    Atripla**

178.    In December 2004, Defendants Gilead and BMS entered into an agreement to develop and commercialize Atripla.  As described above, it was comprised of TDF, FTC and EFV.  Gilead sold TDF as Viread and FTC as Emtriva, and BMS sold EFV as Sustiva.  The agreement included a provision expressly prohibiting either party from marketing Atripla with any generic version of any of its three components (the "No-Generics Restraint"), which would have dramatically reduced its price.  By ensuring that only one version of Atripla would be marketed, using branded components at inflated prices, Defendants unreasonably restrained trade.

179.    If one of the parties sought to terminate the agreement, the terminating party was required to pay the non-terminating party three years of royalty payments and the terminating party would then become the sole member of the joint venture. This substantial penalty discouraged either party from terminating the agreement in the event that a generic version of TDF, FTC, or EFV became available and discouraged the marketing of a competitive form of Atripla with lower-priced generic components, even after the relevant patents had expired.

180.    Defendants further engaged in an aggressive co-promotional marketing campaign to induce prescription switches from TDF, FTC and EFV, which would soon be facing generic competition, to Atripla, which was insulated from generic competition under Defendants' agreement.

43

181.    Defendants' agreement substantially increased Gilead's incentive to move sales and market share from TDF and/or FTC to TDF-based Atripla. The switched sales resulted in BMS selling significantly more EFV than it would have otherwise. The agreement allowed Defendants to maintain a monopoly on the Atripla market, generating higher than normal prices for not only Atripla but the individual standalone components as well, at the expense of drug purchasers, including Plaintiffs.

182.    Gilead and BMS structured their collaboration as a joint venture as a limited liability company named Bristol-Myers Squibb & Gilead Sciences, LLC (n/k/a Gilead Sciences, LLC).  Gilead and BMS granted royalty-free sublicenses to the joint venture for the use of the companies' respective technologies and, in return, were granted a license by the joint venture to use intellectual property resulting from the collaboration.

183.    Defendants' agreement provided for BMS to supply EFV exclusively to the joint venture for use in an FDC with Gilead's TDF and FTC. Likewise, Gilead provided a royalty-free sub-license to the joint venture for supply of its TDF and FTC.

184.    The agreement thus prevented Gilead and BMS (along with other manufacturers) from competing against Atripla with a drug comprised of brand or generic TDF, FTC, and/or EFV, even after the patents expired or generics had gained access to the market. The agreement provided that if either Defendant wanted to avoid this exclusivity by terminating its participation in the joint venture with the other, the terminating party would then become the sole entity in the venture.  Gilead in fact terminated the joint venture in December 2017 and the limited liability company became a wholly owned subsidiary of Gilead Sciences, Inc.

185.    In addition, if either party terminated the joint venture, the other's ability to continue making and selling Atripla would terminate. As a result, even once there was a generic version of a component of the composition, a competitive version of Atripla using that generic component could not come to market.  If neither party terminated the agreement, both would continue to be bound by the exclusivity provision and could not make a competing generic-composition-based version of the FDC; if a party terminated, then the other would no longer

COMPLAINT AND DEMAND FOR JURY TRIAL

have access to the terminating party's composition(s) and could no longer make any version of Atripla.

186.     Defendants' No-Generics Restraint agreement made no independent economic sense.  Absent the restraint, competitors like Gilead and BMS would challenge patents and incorporate generic components or comparable components to produce a competing Atripla FDC as soon as possible.  It would be in their independent economic interest to market a competing generic-drug-based or comparable-drug-based FDCs as soon as possible.

187.     The No-Generics Restraint only benefitted Defendants by impairing competition.  Before they lost patent or regulatory exclusivity neither Gilead nor BMS received any benefit from the No-Generics Restraint because no generic was available/;. The No Generics Restraint agreement produced benefits only after the relevant statutory exclusivities expired. Such contractual relief from competition is anticompetitive.

188.     When generic TDF finally became available in December of 2017, purchasers of the drug should have benefitted from multiple competitive versions of Atripla. Absent the No-Generics Restraint, BMS or a reasonable company in its position would have been motivated to market a competing version of Atripla comprised of generic TDF, generic FTC (once available), and EFV, or alternatively generic TDF, generic 3TC and EFV, while Gilead sold the original version of Atripla.. The price of Atripla would plummet due to competition that should have ensued with the availability of generic TDF.  The Gilead/BMS non-compete scheme prevented purchasers from obtaining those competitive benefits.

189.     Absent Gilead's and BMS's agreement to forgo use of generic components in Atripla FDC formulation(s), an unrestrained competitor in BMS's position would have challenged Gilead's patents one year before expiration of NCE exclusivity on July 2, 2008, and could have entered the market as early as January 2011.

190.     In 2004, when Gilead and BMS entered into their non-compete agreement, Gilead fully expected generic competition for TDF and TDF/FTC years before the January 2018 and 2021 expiration of its respective patents.  BMS likewise expected generic competition years

45

before the July and August 2018 expiration of its patents covering EFV. Defendants' agreement to combine their branded TDF/FTC/EFV components into an FDC while agreeing not to market any other Atripla FDC with generic components substantially extended their expected exclusivity.

191.     As discussed above, Gilead's patents allegedly covering TDF and FTC drew multiple generic challenges.  Knowing its patents were inherently weak and likely to be deemed invalid, Gilead initiated numerous baseless patent infringement lawsuits.

192.     Likewise, BMS's patents purportedly protecting EFV, the third component of Atripla, were formulation, method of use and/or dosing patents, known to be weak and likely to be found invalid. The composition of matter patent for EFV expired in 2013 and the method of use patent for treatment of HIV infection expired in September 2014.  U.S. Patent Nos. 6,639,071 ("the '071 patent") and 65,939,964 ("the '964 patent") (collectively "the EFV Patents") covered particular formulations of EFV.  BMS licensed those patents from Merck Co. as part of a previous acquisition deal between the two companies.  The EFV Patents expired on July 20, 2018 and August 14, 2018.

193.     Multiple generic challenged BMS' EFV Patents.

194.     BMS filed suit against Teva in March of 2010 alleging its generic Atripla would infringe BMS's EFV Patents.  BMS was initially represented by the very same counsel of record who represented Gilead in its Viread patent infringement litigation against Teva.

195.     Like Gilead, BMS filed the baseless Atripla EFV patent infringement lawsuit without regard to the merits, knowing the EFV Patents were weak and likely to be invalidated and fully anticipating imminent generic competition. More specifically, BMS knew that there was a substantial probability that it would lose the patent litigation given the weakness of its EFV Patents and that it would likely face generic competition years prior to the expiration of its patents.

196.     The EFV Patents only covered the crystalline form of efavirenz. In the patent infringement litigation, Teva presented dispositive facts that the claimed compound "inevitably

46

results from the practice of the processes described in the prior art" (the '726 patent) and that the EFV Patents were thus inherently anticipated and/or obvious and invalid.  Because the "prior method" of making efavirenz in the '726 patent was clearly described in the specifications of the '071 and '964 patents and because that work was not done by the inventors of the '071 or '964 patents, the EFV Patents were inherently anticipated.

197.    On June 5, 2013, weeks before the scheduled trial concerning the EFV Patents (and just days after the date which Teva could launch a generic TDF "at risk"), BMS and Teva informed the Court "that they reached a settlement in principle."  The case was officially closed on August 16, 2013.

198.    BMS later issued a press release announcing the resolution of all its EFV and Atripla patent infringement litigation.  It stated: "we believe that loss of exclusivity in the U.S. for efavirenz should not occur until December 2017."  BMS's announcement indicated that it expected to lose exclusivity for EFV on about the same date that Teva had accepted for the launch of its generic TDF in exchange for the anticompetitive MFE.

199.    There are presently several versions of generic EFV on the market. Mylan Pharmaceuticals, Inc., the first filer for EFV, received tentative FDA approval in 2011 and final approval in 2016.  However, Mylan did not launch generic EFV until February 1, 2018, months before the EFV Patents were set to expire. The terms of the parties' settlement agreement were never fully disclosed.

200.    Atripla's Orange Book listed patents were to expire by their own terms in July and August of 2018 for EFV, January of 2018 for TDF and September 2021 for FTC.

201.    In addition to Defendants' unlawful and anticompetitive No-Generics Restraint agreement, Gilead and BMS engaged in marketing to induce and/or reward switching prescriptions to Atripla.

202.    Defendants initially shared marketing and sales efforts, co-promoting Atripla in the U.S. from July 2006 through 2010.

47

203.    Defendants' No-Generics Restraint agreement and joint promotion of Atripla exploited a substantial imperfection in the HIV prescription pharmaceuticals marketplace. Doctors who have switched a patient from one HIV drug to another HIV regime are very reluctant to switch patients back, despite the availability of a generic or lower cost product. Switching costs impair a move back to the original product.

204.    As a result, HIV prescription pharmaceutical sales are "sticky." Doctors and patients are much less likely than in fully competitive markets to switch prescriptions back to the original product. Brand manufacturers can impair generic competition by using their robust sales forces to move the prescription base from an original product facing imminent generic competition to a product that is not facing generic competition.— Once the generic version of the original product becomes available, doctors could in theory begin prescribing it rather than the new brand product. However, having switched the patient from the old to the new product, doctors are unlikely to switch the patient back to the original product.. Timing is critical. If the new product beats the generic version of the original product to the market, it makes as much as 10 times more sales than it otherwise would have made.

205.    Knowing this, Gilead and BMS agreed to join sales forces to co-promote Atripla, employing various marketing schemes to exploit this market defect. Gilead and BMS conspired to switch much of the prescription base from TDF and/or FTC to more expensive Atripla, which was insulated from competition under Defendants' agreement.

206.    In addition to impairing the benefits of generic substitution, the switch to Atripla enabled Gilead to delay introduction of safer and more effective TAF, as alleged below.

**2.    Complera**

207.    On July 16, 2009, Gilead entered into a similar agreement with Janssen Products, L.P. ("Janssen") to develop and commercialize a fixed dose combination drug to be known as Complera. It contained Gilead's Truvada (TDF/FTC) and Janssen's rilpivirine (RPV).

208.    Gilead submitted an NDA for the product on February 10, 2011. On August 10, 2011, the FDA approved the NDA.

48

209.    On May 20, 2011, the FDA approved Edurant, Jansen's standalone RPV product.

210.    Under the parties' agreement, as amended through 2014, Janssen granted Gilead a No-Generics Restraint for the use of RPV in a fixed dose combination drug comprised of TDF, FTC and RPV.  Janssen agreed that it "shall not" "make, use, sell, have sold, offer for sale, or import" a fixed dose combination drug comprised of generic TDF, generic FTC, and RPV.  The agreement also prohibited Janssen from selling any "Other Combination Product" comparable to TDF/FTC/RPV, which precluded Janssen from selling a product make with generic TDF, 3TC (rather than FTC), and RPV.

211.    Under the agreement, Gilead is responsible for manufacturing Complera and distributing it in the United States (and much of the rest of the world).

212.    Under the agreement, Gilead sets the price of Complera and the parties share revenues based on the ratio of the net selling prices of each party's component(s), subject to certain restrictions and adjustments.  The parties agreed that, in the U.S., the selling price of Complera would be the combined prices of Truvada (TDF/FTC) and Edurant (RPV) when sold separately.  Gilead purchases RPV from Janssen for use in Complera at approximately the market price of RPV, less a specified percentage of up to 30%.

213.    Janssen is not permitted to terminate the agreement until after expiration of the last patent covering RPV.

214.    Through 2011, Gilead reimbursed Janssen approximately $100 million in research and development expenses, the maximum amount allowed under the agreement.

215.    When Gilead and Janssen entered into their No-Generics Restraint in 2009, Gilead had recently sued Teva in connection with Teva's first-to-file ANDA for Truvada.  Gilead expected to face generic competition for Truvada as early as May 2011, when Teva's 30-month stay expired.  Jansen's principal patents protecting RPV have expiration dates in the time period 2019 to 2025.

216.    As contemplated by the No-Generics scheme, Gilead cannibalized TDF and FTC sales, encouraging doctors to switch their patients from those products to Complera.

49

217.    As with Gilead's prior agreement with BMS regarding Atripla, the effects of the agreement between Gilead and Janssen would continue even after expiration or invalidation of the relevant patents.

218.    The agreement confirmed that the license from Janssen to Gilead was "exclusive" even as to Janssen, *i.e.*, it prohibited Janssen from commercializing its own fixed dose combination drug containing either (1) generic versions of TDF and FTC and its own RPV or (2) generic versions of TAF and FTC and its own RPV.  Only Gilead has the rights to fixed dose combination drugs with those ingredients, even after generic versions of TDF, FTC and/or TAF become available.

219.    When generic versions of TDF became available in 2017, purchasers should have benefited because a competitor in Janssen's position would have competed with Gilead by marketing a competing version of Complera comprised of generic TDF, 3TC, and RPV.  The combined price of those products would have dropped due to the competition resulting from the availability of generic TDF.

220.    Absent the No-Generics Restraint, Janssen or a reasonable company in Jansen's position would have offered a competing version of Complera long before December 2017 and would have challenged Gilead's patents.  No NCE exclusivity would have barred Janssen from timely seeking FDA approval for a competing fixed dose combination drug because Janssen controlled the NCE exclusivity.  The only NCE-protected ingredient in Complera at the time of its approval was Janssen's RPV, and Janssen, not Gilead, owned the patents covering fixed dose combination drugs comprised of TDF/FTC/RPV.

221.    A competitor in Janssen's position would have submitted its own application for a product containing TDF/FTC/RPV as early as August 2011, and any 30-month stay would have expired in February 2014.  Thus, a competitor in Janssen's position would have competed against Gilead with a fixed dose combination drug comprised of RPV and generic versions of TDF and FTC as early as February 2014.

COMPLAINT AND DEMAND FOR JURY TRIAL

222.    The no-Generics Restraint prevented Janssen from competing until at least December 9, 2025, when it expires.

223.    The No-Generics Restraints with respect to Atripla and Complera artificially inflated prices of their individual components, the fixed dose combination drugs themselves and other cART products.  Fixed dose combination drugs that are formulated with a generic component and a brand component sell for about 40% to 50% less than the combined prices of the brand versions of the two components.  As a result of the No-Generics Restraints, Defendants' products continue to sell for about the same price as the combined prices of the brand components, even after the relevant patents expired and generic components have become available.

224.    Similarly, when an alternative version of a fixed dose combination drug is introduced using a recognized but not identical substitute for one of the components, its price will be about 40% to 50% less than the incumbent's price.  As a result of the No-Generics Restraints, however, only one alternative version  of the affected fixed dose combination drugs is available.  Complera (TDF/FTC/RPV) sells for $35,000 for a yearly course of treatment.  A comparable version made with generic or comparable versions of TDF or 3TC would sell for half that.

225.    Gilead, Janssen and BMS moved sales from their standalone products to the fixed dose combination drugs that they had unlawfully protected by means of the no-Generics Restraints.

**3.      Evotaz**

226.    Gilead entered into another unlawful No-Generic Restraint agreement with BMS relating to the BMS drug Evotaz.  Evotaz is a fixed dose combination product consisting of atazanavir, a protease inhibitor that BMS markets in standalone form as Reyataz, and cobicistat, then an investigational drug developed by Gilead.  Gilead provided BMS with an exclusive license (exclusive even as to Gilead) to use cobicistat in combination with BMS's atazanavir.

51

227.    On February 17, 2010, BMS received notice that Teva had submitted an ANDA with a paragraph IV certification that the patents purportedly covering atazanavir were invalid and would not be infringed by Teva's proposed generic product.  Consequently, BMS could expect to encounter generic competition to Reyataz as early as August 2012 if Teva received approval and launched at the conclusion of the 30-month stay.

228.    On October 26, 2011, after BMS received notice of Teva's ANDA but before Teva could enter the market, BMS and Gilead announced an agreement to jointly develop a drug that would combine BMS's vulnerable atazanavir with Gilead's cobicistat.  On January 29, 2015, the FDA approved the drug, which BMS markets as Evotaz.

229.    The license permitting BMS to use Gilead's cobicistat in Evotaz prohibits Gilead from commercializing and marketing its own fixed dose combination drug containing cobicistat and a generic version of atazanavir, such as the one for which Teva was seeking approval.  This restraint does not terminate until expiration of the last of Gilead's cobicistat patents in 2029.

230.    Generic atazanavir became available in the U.S. in December 2017.  At that time, purchasers should have benefited because: (1) patients could take generic atazanavir in combination with Gilead's cobicistat or another booster; and (2) Gilead or a reasonable company in its position would have competed with BMS by marketing a fixed dose combination drug consisting of generic atazanavir and cobicistat.  The combined price of the two drugs would have plummeted due to competition.  Instead, the Evotaz No-Generics Restraint was intended to, and did, prevent purchasers from obtaining those procompetitive benefits.

231.    As contemplated by the agreement, BMS encouraged doctors to switch prescriptions from Reyataz to Evotaz.

**4.      Prezcobix, Symtuza and Odefsey**

232.    Gilead and Janssen also entered into mutual No-Generics Restraints relating to Gilead's drug Odefsey and Janssen's drugs Prezcobix and Symtuza.

233.    In October 2010, a year after the announcement of the Complera deal, Janssen received notice that Mylan Pharmaceuticals had submitted an ANDA with a paragraph IV

certification that the patents purportedly covering Janssen's Prezista (darunavir) were invalid or would not be infringed by Mylan's proposed generic product.  Consequently, Janssen could expect to encounter generic competition to darunavir as early as April 2013 if Mylan received approval and launched at the conclusion of the 30-month stay.

234.    On June 28, 2011, approximately nine months after Mylan sent Janssen its paragraph IV certification, Janssen and Gilead announced a tentative agreement to jointly develop a fixed dose combination drug combining Janssen's vulnerable Prezista with Gilead's then-investigational drug cobicistat. The FDA approved the drug on January 29, 2015, and Janssen markets the drug as Prezcobix.  Gilead and Janssen made the Prezcobix deal contingent on concluding a further agreement to coformulate Janssen's darunavir with Gilead's TAF, FTC and cobicistat.   The FDA approved that drug on July 17, 2018, and Janssen now markets it as Symtuza.

235.    On December 29, 2014, Gilead and Janssen entered into another No-Generic Restraint relating to Odefsey, a fixed dose combination drug containing TAF, FTC, and Janssen's RPV.  The FDA approved that product, which Gilead markets as Odefsey, on March 1, 2016.  Under the No-Generic Restraint agreement, Janssen is prohibited from marketing a competing version of Odefsey using generic versions of TAF and FTC and its own RPV.

236.    Without mutual No-Generic Restraints, both Gilead and Janssen would have been vulnerable to generic-component-based competition from the other.  Absent the Restraints, a competitor in Gilead's position would have marketed competing versions of Prezcobix and Symtuza using generic versions of darunavir in combination with its own components (cobicistat in the case of Prezcobix, and TAF, FTC and cobicistat in the case of Symtuza).  Moreover, a competitor in Janssen's position would have marketed a competing version of Odefsey using generic versions of TAF and FTC as soon as those products became available, or would have used comparable components.  As a result of the mutual No-Generic Restraints, those competitive benefits were lost.

53

237.     These agreements use virtually identical language.  Each agreement prohibits either party from making comparable fixed-dose combination drugs using generic versions of the other party's components, even after the relevant patents have expired.  Absent those agreements, one of the two parties would have competed with the other by launching a comparable version of the drug using generic versions of the other party's components as soon as the relevant patent or patents expired, or would have challenged those patents and entered the market even earlier.

238.     Gilead and Janssen entered into the Symtuza agreement on December 29, 2014.  The same day, and in the same document, Gilead and Janssen finalized their June 2011 agreement regarding Prezcobix.  Also on the same day, Gilead and Janssen amended their Complera agreement to include Odefsey.  The three agreements relating to Complera/Odefsey, Prezcobix and Symtuza are part of a single conspiracy in which both Gilead and Janssen mutually agreed to refrain from competing against the other's vulnerable compositions, even after the relevant patents expire.

239.     As contemplated by the No-Generics scheme, Janssen began to encourage doctors to switch prescriptions from Prezista to Prezcobix and, later, to Symtuza.  As of 2017, Janssen had succeeded in shifting at least 40% of Prezista prescriptions to Prezcobix.

**D.     Delay in Introducing TAF**

240.     As part of its unlawful scheme, Gilead purposefully and deliberately delayed its development and introduction of safer and more effective standalone TAF, delayed its development and clinical research for PrEP HIV Medications, and further delayed generic competition that would have dramatically reduced pricing and increased access to such preventative HIV medications sooner. Indeed, Gilead's product-hopping and anticompetitive marketing schemes were designed to delay and suppress competition to maintain artificially inflated pricing.  This conduct has resulted in limited access and affordability of PrEP medications.

54

COMPLAINT AND DEMAND FOR JURY TRIAL

241.     Before the FDA approved Viread (TDF) in 2001, Gilead had discovered a second pro-drug version of tenofovir, known as TAF. TDF and TAF are both prodrugs from the same parent drug tenofovir. However, TAF is superior because it only requires a fraction of the dose TDF requires to achieve the same therapeutic effect. The lower plasma concentrations required for TAF results in correspondingly reduced toxicities compared to TDF, making TAF safer to use. Despite early awareness that TAF had superior safety, efficacy and side effect profiles, Gilead deliberately and strategically chose to delay development of TAF and withheld TAF-based products from entering the market to bolster its unfair and anti-competitive business tactics and arrangements and extend its ill-gotten TDF-based monopoly and profits.

242.     As early as 2002, Gilead realized the benefits of TAF's smaller doses and lowered plasma concentrations compared to TDF. Indeed, Gilead conducted clinical trials of TAF in humans in 2002, with the explicit goal, as articulated by Gilead's senior executive, of "deliver[ing] a more potent version of tenofovir that can be taken in lower doses, resulting in better antiviral activity and fewer side effects…."

243.     In 2003, Gilead reported to investors that the "[i]nitial data look promising" and that Gilead was "excited" about TAF's prospects. In January 2004 Gilead again reported to investors that the TAF results were "promising" and that it was "continuing the clinical development of [TAF] … based on favorable Phase I/II results." In March 2004, Gilead reported that "[b]ased on data from our Phase 1/2 clinical trials of [TAF], we have begun developing a Phase 2 program for the treatment of HIV infection…."

244.     In May 2004, Gilead reported that the TAF clinical studies had confirmed that TAF gets higher concentrations of tenofovir into the blood than does TDF, thus allowing the patient to take a far smaller dose, thereby significantly reducing the risk of adverse side effects.

245.     Gilead continued to praise the advantages of TAF and its potential for HIV treatment for years to investors through at least June 2004, shortly before receiving approval for Truvada in July of 2004. A few months later on October 21, 2004, Gilead abruptly changed

COMPLAINT AND DEMAND FOR JURY TRIAL

course, announcing that it had decided to shelve further development of promising TAF treatments. The announcement attributed the decision to "an internal business review."

246.   From November 2015 to November 2016, Gilead made TAF available only as a component of its fixed dose combination drugs, and not as a standalone product.  During that time, while Gilead aggressively moved prescriptions from the TDF-based products to its new line of TAF-based products, doctors could not prescribe standalone TAF together with HIV drugs manufactured by Gilead's competitors.  Any patient who wanted TAF could get it only by buying a Gilead fixed dose combination drug.

247.   In addition, Gilead refused to seek FDA approval of standalone TAF for use in the treatment of HIV.  It sought approval of standalone TAF as the brand drug Vemlidy only for use in the treatment of chronic Hepatitis B.

248.   Gilead held TAF in reserve for over a decade despite its known advantages, withholding TAF until just before generic competition was about to erode pricing and profits for its flagship TDF-based Viread, Truvada and Atripla.  Knowing its TDF-based franchise was about to face competition from Teva's generic TDF in December of 2017 , Gilead launched TAF and Descovy in or around 2016.

249.   As part of its scheme, Gilead launched an aggressive product hopping scheme aimed at switching the prescription base from TDF-based Truvada to its patent-protected and higher priced TAF-based Descovy. The timing of Gilead's plan was crucial: it needed to induce switches to Descovy prior to the anticipated entry of Teva's generic Truvada. To accomplish this, Gilead actively promoted TAF-based Descovy as preferable to Truvada. Gilead disseminated misleading propaganda mischaracterizing the inappropriateness of Truvada and its associated adverse events and risk profiles while touting the alleged benefits of Descovy. The goal of Gilead's deceptive marketing was to switch as many prescriptions as possible from Truvada to Descovy.

250.   Gilead's scheme was successful. The company boasted about its better than expected success in switching 10% of Truvada patients to Descovy in just the first few months

COMPLAINT AND DEMAND FOR JURY TRIAL

after Descovy's launch. By the end of the second quarter of 2020, Gilead had reportedly switched 38% of Truvada patients to Descovy, and was well on its way to reaching its 40-45% switching goal.

251.    Gilead's unlawful conduct has resulted in years of artificially inflated and over-priced TDF-based HIV medications, unfairly restraining competition, and reducing incentives to innovate and bring safer more effective products to the market. Such schemes allowed Gilead to delay PrEP research and further substantially delay the introduction of TAF and TAF-based Descovy. Moreover, Gilead's TDF to TAF product-hopping scheme has cannibalized prescriptions and market share.

252.    Absent Defendants' concerted anticompetitive conduct and Gilead's product-hopping and marketing schemes, Plaintiffs would have purchased TDF-based and TAF-based HIV medications at substantially reduced pricing sooner.

253.    Gilead's business practices, anticompetitive patent settlement agreements and related conduct severely impaired competitive forces and manipulated the markets for both TDF-based and TAF-based HIV medications, substantially increasing prices and reducing innovation. Acting in concert with its competitors, Gilead was able to stall the introduction of TAF until the very last moment, ensuring it maximized the combined period of market exclusivities (at higher prices and profit margins) for its TDF-based and TAF-based franchises.

254.    Gilead sought to earn as much revenue as possible by maximizing profits from the exclusivities and higher-pricing of its TDF-based franchise before transitioning to its newly introduced TAF-based franchise. It took this action despite having researched and recognized the safety and efficacy benefits of TAF for years.

255.    Defendants' unlawful conduct, alleged herein, substantially diminished the competitive pressures that force manufacturers to innovate and introduce better and safer products sooner. Gilead's collusive collaboration with BMS to market Atripla and its numerous patent infringement settlement agreements abating generic competition for Atripla's sub-components (Viread (TDF), Emtriva (FTC) and Truvada (TDF/FTC)) shielded Gilead from

57

competitive pressures. Gilead was able to raise prices year after year for inferior TDF-based HIV medications, allowing it to delay improved TAF until it had generated as much revenue as possible from its TDF-based franchise, propped up by dubious patent portfolios and further supported by calculated and unfair business arrangements that effectively restrained generic competition and prevented price erosion.

256.    Defendants' collective actions reduced innovation and effectively prevented safer, more effective and/or more affordable preventative HIV Medications from entering the market. Most importantly it created a cost barrier and limited access to life-saving HIV medications necessary to prevent and treat the spread of HIV infections and impaired efforts to end the HIV public health epidemic. Not until Gilead faced multiple generic challenges to its weak, evergreened and ancillary TDF Patents did Gilead finally seek to introduce its TAF-Based products. Gilead told investors in 2010 that "a new molecule" would replace its TDF-Based sales and add "a great deal of longevity" to its HIV franchise. This "new molecule" was not new at all—it was the TAF prodrug that Gilead had discovered a decade earlier but that Gilead had held in reserve in order to maximize its profits.

257.    Gilead abandoned development of TAF in 2004, around the same time as Gilead and BMS collusively agreed to market TDF-based Atripla without generic components. Gilead concluded that it could use the No-Generic Restraints to shield its TDF-based HIV medications and franchise from competition for years. With the BMS deal in place, Gilead shelved its TAF project for later use as part of its product-hopping strategy once generic competition to its TDF-based HIV Medications became imminent. Gilead was able to further delay generic competition, as well as the introduction of TAF, through its unlawful patent settlement agreements as alleged herein.

258.    Gilead itself eventually made explicit the connection between its anticompetitive deal with BMS and the shelving of TAF. At an investor conference in March 2011, Kevin Young, the executive vice president of Gilead's commercial operations, admitted that in 2004 Gilead "didn't bring TAF through development because at the time we were launching Truvada,

COMPLAINT AND DEMAND FOR JURY TRIAL

launching Atripla . . ." Gilead never amended the BMS joint venture agreement to provide BMS with the opportunity to commercialize a TAF-based successor to Atripla. Nor at that time did Gilead file an NDA to market a TAF-based successor product to Atripla.

259.    On May 3, 2011, another Gilead executive confirmed why Gilead sat on TAF for over a decade. Holding TAF in reserve to later reformulate TDF-based FDCs would "bring quite a bit of longevity to the Gilead portfolio," securing an "important opportunity for Gilead long-term." It allowed Gilead to have another line extension and TAF-based franchise.

260.    In addition to deliberately withholding a drug that would reduce enormous human suffering, Defendants' unlawful conduct also caused a delay in the ability of generic manufacturers and other competitors to challenge Gilead's TAF-related patents. As noted above, NCE exclusivity prohibits a generic manufacturer from even filing an ANDA with respect to the branded product until a year before the end of the NCE exclusivity. Moreover, the Hatch-Waxman automatic 30-month stay does not commence until after the five-year NCE exclusivity expires. So, a generic version of an NCE-protected drug cannot realistically launch until at least 7.5 years after the brand manufacturer first receives approval of the NCE-protected drug.

261.    Accordingly, Gilead's delay in marketing TAF-based HIV Medications dramatically delayed the date on which generic manufacturers could challenge the Vemlidy and Descovy patents. Earlier generic entry would have significantly reduced pricing for these products.

262.    Absent Gilead's and BMS's agreement, these generic entry dates would have been much earlier. If Gilead had not shelved TAF development, a reasonable manufacturer in its position would have begun marketing TAF and TAF-based FDCs like Descovy no later than 2007.

263.    Thus, instead of NCE protection on TAF-based products, like Descovy, expiring in November 2020, and the Hatch-Waxman 30-month stays expiring in May 2023, NCE exclusivity would have expired in November 2011, and the Hatch-Waxman 30-month stays

would have expired in May 2013. And those living with HIV or at risk for infection of HIV would already have generic versions of TAF-based products.

264.    Forgoing introduction of TAF caused Gilead to lose millions of dollars in TAF-based HIV Medications sales every year. But impairing competitors' entry into the marketplace with TAF-Based products and lower priced generic and/or comparable products was far more lucrative and valuable to Gilead. Delaying TAF only made economic sense for Gilead because of its anticompetitive effects. As a result of Gilead's unfair and anti- competitive business tactics, purchasers have purchased and paid for over-priced TAF-based HIV Medications.

265.    Not only did Gilead delay the introduction of safer and more effective TAF in order to unlawfully extend its monopolistic position and unfairly reap the maximum profits from its TDF franchise, Gilead also intentionally postponed research and development regarding the use of tenofovir for PrEP indications in order to free-load and take unfair advantage of ground-breaking government research funded by taxpayer dollars. Around the same time that Gilead decided to delay development of TAF and collusively collaborate with BMS to insulate its weak and vulnerable TDF and FTC Patents from competition,, the government and charitable foundations were investing millions of dollars in pivotal investigations and research for the use of tenofovir (TAF and TDF) with FTC for PrEP.

266.    Indeed, the FDA's approval of a PrEP indication for Truvada in 2012 was largely based on government issued patents and pre-clinical models, studies and research, funded by hundreds of millions of taxpayer dollars. Unlike the licenses received and the modest royalties paid by Gilead for access and licenses to Emory and Czech TDF and FTC technologies, Gilead has yet to obtain licenses to the government's patents or pay the government reasonable royalties for the use of its novel discoveries relating to tenofovir for PrEP.

267.    As part of its scheme to move TDF-based fixed dose combination drugs to TAF-based fixed dose combination drugs, Gilead intentionally refused to reduce the toxicity of TDF-based Stribild.  Making Stribild less safe than other TDF products would help Gilead later move prescriptions from TDF-based Stribild to TAF-based Genvoya.

60

268.    Gilead's clinical trials on Stribild showed that it was more toxic that unboosted TDF, and resulted in more adverse events and treatment discontinuations.  Gilead formulated Stribild with 300 mg of TDF together with the pharmacokinetic booster cobicistat.  This is the same dosage in which Gilead sold TDF as a standalone product, *i.e.*, for use without a booster. Gilead did not reduce the dose of TDF to reduce the toxicity of Stribild.

269.    At the same time, Gilead artificially increased Stribild's price.  Since launching Stribild in 2012, Gilead had consistently raised its price once a year, approximately 5% to 7%. In connection with the switch to TAF-based Genvoya in 2016, however, Gilead took its normal annual increase on Stribild plus another mid-year increase of  7%.  That price increase boosted the wholesale price of a 12-month supply of Stribild to $34,686, substantially higher than the $30,930 price of Genvoya.  This price increase only made economic sense to Gilead because it encouraged switching from Stribild to Genvoya and thereby avoided generic competition.

270.    In addition, rather than innovate and invest in costly research and development, Gilead passively sat on its hands for years letting the government do the foundational research. Like Gilead's reliance on licenses to intellectual property for TDF and FTC, the game-changing 2012 approval of Truvada for PrEP was also primarily based on research and development done by others – namely the government and charitable foundations.

271.    Gilead's 2019 Annual Report acknowledged the market dynamics and likely impact of Gilead's marketing efforts and product-hopping schemes to switch prescriptions from Truvada (soon to be facing generic competition and reduced pricing) to patent and exclusivity protected Descovy for PrEP:

> Truvada (FTC/TDF)-based product sales decreased in the United States . . . in 2019 compared to 2018. The decrease in U.S. sales was primarily due to lower sales volume as a result of patients switching to newer regimens containing FTC/TAF, partially offset by the increased usage of Truvada for PrEP. The decrease in Europe sales was primarily due to lower sales volumes of Truvada and Atripla as a result of broader availability of generic versions and patients switching to newer regimes containing FTC/TAF. We expect a decline in our sales of Truvada in the United States as

61

patients *switch to Descovy for PrEP from Truvada for PrEP and expected entry of generic versions in late 2020*.

## VI.   INTERSTATE COMMERCE

272.    The drugs at issue in this case are sold in interstate commerce.  Defendants' unlawful activities, as alleged above, have occurred in, and have had a substantial impact on, interstate commerce.

## VII.   MARKET POWER

273.    At all relevant times, there existed a separate relevant product market for each Relevant Drug and its corresponding AB-rated generic equivalents, and the seller of each Relevant Drug possessed substantial market power in that relevant market.  Each seller of a Relevant Drug had the power to maintain the price of that drug at supracompetitive levels without losing sufficient sales to other drugs to make the supracompetitive prices unprofitable.

274.    A small but significant, non-transitory increase in the price of each Relevant Drug above the competitive level did not cause a loss of sales sufficient to make the price increase unprofitable. At competitive prices, none of the Relevant Drugs exhibits significant, positive cross-price elasticity of demand with respect to any product other than the AB-rated generic versions of each Relevant Drug.

275.    The existence of other branded HIV drugs has not constrained the price of each Relevant Drug to the competitive level.

276.    Each seller of a Relevant Drug needed to control only that Drug and its AB-rated generic equivalents, and no other products, in order to maintain the price of the Drug profitably at supracompetitive prices. Only the entry of a competing, AB-rated version of the brand drug would render the brand manufacturer unable to profitably maintain  supracompetitive prices.

277.    The seller of each Relevant Drug sold that Drug at prices well in excess of marginal costs, substantially in excess of the competitive price, and enjoyed unusually high profit margins.

278.    Each seller of a Relevant Drug had the ability to control the prices of that Drug and exclude relevant competitors. Among other things: (a) generic versions of each drug would

62

1  have entered the market at substantial discounts to the brands but for Defendants' anticompetitive

2  conduct; (b) the gross margin on each drug was at all times at least 70%; and (c) the seller of each

3  Relevant Drug never lowered the price of the Drug to the competitive level in response to the

4  pricing of non-AB-rated branded or generic drugs.

5      279.   At all relevant times, Gilead's gross profit margin on its cART drugs, collectively,

6  has exceeded 75% and has reached as high as 91%. These margins are approximately 15 times

7  those that indicate substantial market power.

8      280.   One purpose and effect of Defendants' anticompetitive conduct was to impair

9  competition from AB-rated generic versions of each of the Relevant Drugs.

10     281.   At all relevant times, the market for each Relevant Drug was protected by high

11  barriers to entry due to patent protection, the high cost of entry and expansion, expenditures in

12  marketing and physician detailing, and state statutes that require prescriptions for the purchase of

13  the products at issue and restrict substitution of those products at the pharmacy counter. The

14  products in these markets require significant investments of time and money to design, develop,

15  and distribute. In addition, the markets require government approvals to enter and/or may be

16  covered by patents or other forms of intellectual property. Defendants' unlawful conduct further

17  restricted entry. Thus, during the relevant time, existing and potential market entrants lacked the

18  ability to enter the market and/or expand output quickly in the short run in response to

19  Defendants' higher prices or reduced output.

20     282.   In addition to the separate product markets for each of the seventeen Relevant

21  Drugs and their respective AB-rated equivalents, there is a broader relevant product market for

22  cART drugs generally.  A seller that controlled the entire output of cART drugs (*e.g.*, as a result

23  of mergers) would have even greater market power, and would charge even higher prices, than a

24  seller that controlled the output of a single Relevant Drug.  The fact that the price of individual

25  cART drugs is set so high that it may be constrained by the existence of other cART drugs *at*

26  *current prices* does not alter the fact that those other cART drugs do not constrain prices to the

27  competitive (*i.e.*, generic) level, or that there are relevant product markets for each of the

28  seventeen Relevant Drugs and their respective AB-rated generic equivalents.

63

283.    Some of the anticompetitive conduct alleged in this Complaint was designed to suppress competition in the broader market for cART drugs generally, which Gilead dominates. More than 80% of patients starting a cART regimen in the United States, and more than 80% of patients continuing such a regimen, take one or more of Gilead's products every day.

284.    The relevant geographic market is the United States.

## VIII.    MARKET EFFECTS

285.    By impeding competition, Defendants' anticompetitive conduct caused Plaintiffs to pay more than they would have paid for branded and generic versions of each Relevant Drug. Earlier entry of an AB-rated generic version of each Drug would have given purchasers the choice between the Relevant Drug and its generic equivalents, which would have been priced substantially below the brand.  Every state's pharmacy substitution laws require or encourage pharmacies to substitute AB-rated generics for branded prescription pharmaceuticals whenever possible. Absent Defendants' anticompetitive conduct, Plaintiffs and their assignors would have saved hundreds of millions of dollars by purchasing generic versions of each Relevant Drug earlier. Defendants' anticompetitive conduct caused Plaintiffs to incur overcharges on their purchases of both branded and generic versions of the Relevant Drugs.

286.    Defendants' anticompetitive conduct created and extended monopolies on each Relevant Drug.  Absent Defendants' anticompetitive conduct, generic versions of each Relevant Drug would have been sold earlier than they actually were.

287.    Defendants' unlawful conduct also harmed Plaintiffs by increasing and artificially inflating the prices charged for generic versions of the relevant Drugs if and when those generic versions became or will become available.  When entering a market, generic manufacturers price their products based on a percentage discount off of the then-prevailing brand price. Absent Defendants' unlawful conduct, generic versions of the Relevant Drugs would have entered the market sooner and would have been priced at a discount to the lower then-prevailing brand price rather than the higher brand price that prevailed at the time of actual generic entry.  Thus, Defendants' unlawful conduct has caused Plaintiffs to pay substantial overcharges on their purchases of generic versions of each Relevant Drug.

64

1

## IX.   TOLLING

2      288.    By virtue of their assignments, Plaintiffs are members of the putative class on

3   whose behalf a class action was filed on September 29, 2020.  *See FWK Holdings, LLC v. Gilead*

4   *Sciences, Inc. et al.*, Case No. 3:20-cv-06793-EMC (N.D. Cal.). The filing of that action tolled the

5   statute of limitations applicable to Plaintiffs' assigned claims.  Antitrust plaintiffs obtain a cause

6   of action each time they purchase a product at a price that is higher than it would otherwise be as

7   a result of an antitrust violation.  Thus, without the benefit of any tolling doctrine other than class

8   action tolling, Plaintiffs are entitled to recover overcharges on purchases made within the four

9   years prior to the filing of the *FWK Holdings* case—*i.e.*, on all purchases of the Relevant Drugs

10  or their generic equivalents made on or after September 29, 2016.

11

## X.   IMPACT AND CONTINUING INJURY TO PLAINTIFFS

12      289.    During the relevant period, Plaintiffs and their assignors purchased substantial

13  quantities of the Relevant Drugs (and, in some cases, generic versions of the Relevant Drugs) at

14  supracompetitive prices.  As a result of Defendants' illegal conduct, Plaintiffs (and their

15  assignors) were compelled to pay, and did pay, artificially inflated prices for their requirements of

16  those Drugs.  Those prices were substantially greater than the prices that would have been paid

17  absent the illegal conduct alleged herein, because: (1) the prices of the Relevant Drugs were

18  artificially inflated by Defendants' illegal conduct; (2) Plaintiffs were deprived of the opportunity

19  to purchase lower-priced generic versions of the Relevant Drugs, which they would have done

20  had they had the opportunity; and (3) when they ultimately became or will become available, the

21  prices of generic versions of the Relevant Drugs were or will be higher than they would have

22  been absent Defendants' unlawful conduct.

23      290.    As a direct consequence of Defendants' antitrust violations, Plaintiffs have

24  sustained substantial loss and damage to their business and property in the form of overcharges.

25  The full amount of such damages will be calculated after discovery and upon proof at trial.

26      291.    As a result of Defendants' unlawful conduct, Plaintiffs and their assignors

27  continue to pay overcharges today, notwithstanding the launch of generic versions of some of the

28  Relevant Drugs.   The commencement of generic competition does not immediately create a

COMPLAINT AND DEMAND FOR JURY TRIAL

competitive environment indistinguishable from the environment that would have existed had generic competition begun much earlier.  In fact, it can take considerable time for the process of generic competition to eliminate the effects of prior anticompetitive conduct, for several reasons, all of which apply here.

292.   First, generic substitution rates do not immediately reach their maximum level when an AB-rated generic drug is launched.  While generic substitution by Plaintiffs typically reaches a level of 90% in approximately three months, generic substitution rates continue to increase gradually and incrementally after that time and eventually reach 95% or more, at which point they plateau.  It may take a year or longer for generic substitution rates to reach this maximum level.  Until they do, the actual generic substitution rate will be lower than it would have been had generic entry occurred earlier and Plaintiffs (or their assignors) will continue to purchase units of the branded drug that would have been replaced with units of the less expensive generic drug but for the antitrust violation.

293.   Second, generic prices do not immediately drop to the level they would have achieved had generic competition begun earlier.  Generic prices typically fall over time even in the absence of additional generic entrants so long as the number of generic manufacturers in the market does not decrease.  In this case, generic prices were high, both because of price increases on the Relevant Drugs and because Teva and other generic entrants did not face competition from other generics upon launch.  Even after additional generics entered the markets, generic prices have remained relatively high and continue to remain relatively high today.  Had generic competition begun much earlier, as it would have absent Defendants' unlawful conduct, inter-generic competition would have been underway for a longer period of time and generic prices would have fallen to lower levels than the generic prices Plaintiffs (or their assignors) are paying today.

294.   The fact that generic substitution rates and generic prices can take considerable time to reach the equilibrium levels they would have reached had generic competition begun earlier means that Plaintiffs will continue to pay overcharges on their purchases of the Relevant Drugs and, where available, their generic equivalents for some time to come.

66

COMPLAINT AND DEMAND FOR JURY TRIAL

295.    Plaintiffs' injury is ongoing.  Defendants' conduct threatens continuing loss and damage to Plaintiffs unless enjoined by this Court.

## XI.   CLAIMS FOR RELIEF

### CLAIM ONE: REVERSE-PAYMENT AGREEMENT
### (GILEAD AND TEVA--VIREAD)

296.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendants Gilead and Teva.

297.    Defendants violated 15 U.S.C. § 1 by entering into and adhering to a contract, combination or conspiracy in unreasonable restraint of trade, namely Gilead's agreement to make a reverse payment to Teva in exchange for Teva's agreement to delay its launch of generic Viread until December 15, 2017.

298.    At all relevant times, Defendant Gilead had substantial market power with respect to sales of Viread and its AB-rated generic equivalents in the United States.

299.    As alleged in detail above, on or about February 22, 2012, Defendants entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Gilead agreed to pay, and Teva agreed to receive, substantial consideration in exchange for Teva's agreement to delay bringing its generic version of Viread to the market.  The the purpose and effect of the reverse payment were to: (a) delay generic entry of Viread in order to lengthen the period in which Gilead would earn supracompetitive profits on sales of Viread; (b) allow Teva to earn supracompetitive profits on generic Viread due to the absence of competition from other generic manufacturers; (c) delay the date that other generic manufacturers would enter that market; and (d) raise and maintain the prices that Plaintiffs would pay for Viread and its AB-rated equivalents at supracompetitive levels.

300.    There is and was no legitimate, procompetitive justification for the anticompetitive restraint. Even if there were some conceivable and cognizable justification, the Viread reverse payment was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the restraint's anticompetitive effects on direct purchasers, competition, and consumers.

COMPLAINT AND DEMAND FOR JURY TRIAL

301.     As a direct result of Defendants' violation of 15 U.S.C. § 1, Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business or property. Plaintiffs' injury consists of having paid higher prices for their requirements of Viread and its generic equivalents, and continuing to pay higher prices, than they would have paid in the absence of the violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.

### CLAIM TWO: REVERSE-PAYMENT AGREEMENT (GILEAD AND TEVA--ATRIPLA)

302.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendants Gilead and Teva.

303.     Defendants violated 15 U.S.C. § 1 by entering into and adhering to a contract, combination or conspiracy in unreasonable restraint of trade, namely Gilead's agreement to make a reverse payment to Teva in exchange for Teva's agreement to delay its launch of generic Atripla until September 30, 2020.

304.     At all relevant times, Defendant Gilead had substantial market power with respect to sales of Atripla and its AB-rated generic equivalents in the United States.

305.     As alleged in detail above, in or about February 2014, Defendants entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Gilead agreed to pay, and Teva agreed to receive, substantial consideration in exchange for Teva's agreement to delay bringing its generic version of Atripla to the market.  The purpose and effect of the reverse payment were to: (a) delay generic entry of Atripla in order to lengthen the period in which Gilead would earn supracompetitive profits on sales of Atripla; (b) allow Teva to earn supracompetitive profits on generic Atripla due to the absence of competition from other generic manufacturers; (c) delay the date that other generic manufacturers would enter that market; and (d) raise and maintain the prices that Plaintiffs would pay for Atripla and its AB-rated equivalents at supracompetitive levels.

306.     There is and was no legitimate, procompetitive justification for the anticompetitive restraint. Even if there were some conceivable and cognizable justification, the Atripla reverse

68

payment was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the restraint's anticompetitive effects on direct purchasers, competition, and consumers.

307.    As a direct result of Defendants' violation of 15 U.S.C. § 1, Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business or property. Plaintiffs' injury consists of having paid higher prices for their requirements of Atripla and its generic equivalents, and continuing to pay higher prices, than they would have paid in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.

## CLAIM THREE: REVERSE-PAYMENT AGREEMENT
## (GILEAD AND TEVA--TRUVADA)

308.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendants Gilead and Teva.

309.    Defendants violated 15 U.S.C. § 1 by entering into and adhering to a contract, combination or conspiracy in unreasonable restraint of trade, namely Gilead's agreement to make a reverse payment to Teva in exchange for Teva's agreement to delay its launch of generic Truvada until September 30, 2020.

310.    At all relevant times, Defendant Gilead had substantial market power with respect to sales of Truvada and its AB-rated generic equivalents in the United States.

311.    As alleged in detail above, in or about February 2014, Defendants entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Gilead agreed to pay, and Teva agreed to receive, substantial consideration in exchange for Teva's agreement to delay bringing its generic version of Truvada to the market. The purpose and effect of the reverse payment were to: (a) delay generic entry of Truvada in order to lengthen the period in which Gilead would earn supracompetitive profits on sales of Truvada; (b) allow Teva to earn supracompetitive profits on generic Truvada due to the absence of competition from other generic manufacturers; (c) delay the date that other generic

COMPLAINT AND DEMAND FOR JURY TRIAL

manufacturers would enter that market; and (d) raise and maintain the prices that Plaintiffs would pay for Truvada and its AB-rated equivalents at supracompetitive levels.

312.    There is and was no legitimate, procompetitive justification for the anticompetitive restraint. Even if there were some conceivable and cognizable justification, the Truvada reverse payment was not necessary to achieve such a purpose, and, in any event, such procompetitive effects would be outweighed by the restraint's anticompetitive effects on direct purchasers, competition, and consumers.

313.    As a direct result of Defendants' violation of 15 U.S.C. § 1, Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business or property. Plaintiffs' injury consists of having paid higher prices for their requirements of Truvada and its generic equivalents, and continuing to pay higher prices, than they would have paid in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.

### CLAIM FOUR: MONOPOLIZATION
### (GILEAD--SPECIFIED DRUGS)

314.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendant Gilead.

315.    Defendant Gilead violated 15 U.S.C. § 2 by monopolizing the markets for the following Relevant Drugs and their respective AB-rated generic equivalents: Viread; Truvada; Complera; and Odefsey.

316.    At all relevant times, Defendant Gilead possessed substantial market power (*i.e.*, monopoly power) with respect to each of the drugs identified in paragraph 320.  Gilead possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

317.    That market power is coupled with strong regulatory and contractual barriers to entry into the market.

70

318.    As alleged extensively above, Gilead willfully obtained and maintained its monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen, and injured Plaintiffs thereby.

319.    As alleged above, Gilead knowingly, willfully, and wrongfully maintained monopoly power and harmed competition by, *inter alia*: (a) entering into unlawful reverse-payment agreements with Teva relating to Viread, and Truvada; (b) delaying the development of standalone TAF in order to drive patients to the fixed-dose combination drugs that Gilead had shielded from generic competition; and (c) entering into and abiding by the illegal No-Generic Restraints.

320.    It was Gilead's conscious objective to further its dominance through exclusionary conduct.

321.    The purpose and effect of Gilead's conduct was to maintain monopoly power that would otherwise have been eliminated through normal competitive processes, in violation of Section 2 of the Sherman Act.

322.    To the extent that Gilead is permitted to assert one, there is and was no cognizable, procompetitive justification for their exclusionary conduct that outweighs its harmful effects. Even if there were some conceivable justification that Gilead was permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

323.    Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business and property as a result of Gilead's monopolization in violation of Section 2 of the Sherman Act.  Plaintiffs' injury consists of having paid higher prices for their requirements of the drugs identified in paragraph 315, and continuing to pay higher prices, than Plaintiffs would have paid in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.

71

COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

**CLAIM FIVE: MONOPOLIZATION**
**(GILEAD SCIENCES, LLC--ATRIPLA)**

3

4

5

324.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendant Gilead Sciences, LLC f/k/a Bristol-Myers Squibb & Gilead Sciences, LLC.

6

7

325.    Defendant Gilead Sciences, LLC violated 15 U.S.C. § 2 by monopolizing the market for Atripla and its AB-rated equivalents in the United States.

8

9

10

11

326.    At all relevant times, Defendant Gilead Sciences, LLC possessed substantial market power (*i.e.*, monopoly power) with respect to Atripla and its AB-rated equivalents.  It possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

12

13

327.     That market power is coupled with strong regulatory and contractual barriers to entry into the market.

14

15

16

328.    As alleged extensively above, Gilead Sciences, LLC willfully maintained that monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen, and injured Plaintiffs thereby.

17

18

329.    It was Gilead Sciences, LLC's conscious objective and specific intent to further its dominance through exclusionary conduct.

19

20

21

22

330.    As stated more fully above, Gilead Sciences, LLC knowingly, willfully, and wrongfully conspired to maintain monopoly power and harm competition by entering into and abiding by: (i) the reverse-payment agreement with Teva relating to Atripla and (ii) the No-Generics Restraint relating to Atripla.

23

24

25

331.    Gilead Sciences, LLC's purpose and effect was to maintain monopoly power that would otherwise have been eliminated through normal competitive processes, in violation of Section 2 of the Sherman Act.

26

27

332.    To the extent that Gilead Sciences, LLC is permitted to assert one, there is and was no cognizable, procompetitive justification for their exclusionary conduct that outweighs its

28

72

COMPLAINT AND DEMAND FOR JURY TRIAL

harmful effects. Even if there were some conceivable justification that Defendant were permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

333.    Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business and property as a result of Defendant's monopolization in violation of Section 2 of the Sherman Act. Plaintiffs' injury consists of having paid higher prices for their Atripla requirements, and continuing to pay higher prices, than they would have paid in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendant's conduct unlawful.

**CLAIM SIX: MONOPOLIZATION**
**(GILEAD—cART MARKET)**

334.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendant Gilead.

335.    Defendant Gilead violated 15 U.S.C. § 2 by monopolizing the market for cART treatment regimens in the United States.

336.    At all relevant times, Defendant Gilead possessed substantial market power (*i.e.*, monopoly power) with respect to the market for cART treatment regimens in the United States. Gilead possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

337.    That market power is coupled with strong regulatory and contractual barriers to entry into the market.

338.    As alleged extensively above, Gilead willfully maintained that monopoly power by using restrictive or exclusionary conduct, rather than using greater business acumen, and injured Plaintiffs thereby.

339.    It was Gilead's conscious objective and specific intent to further its dominance through exclusionary conduct.

340.    As stated more fully above, Gilead knowingly, willfully, and wrongfully maintained its monopoly power and harmed competition through the conduct specified above.

341.    Gilead's purpose and effect was to maintain monopoly power that would otherwise have been eliminated through normal competitive processes, in violation of Section 2 of the Sherman Act.

342.    To the extent that Gilead is permitted to assert one, there is and was no cognizable, procompetitive justification for their exclusionary conduct that outweighs its harmful effects. Even if there were some conceivable justification that Gilead were permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

343.    Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business and property as a result of Gilead's monopolization in violation of Section 2 of the Sherman Act. Plaintiffs' injury consists of having paid higher prices for their cART requirements, and continuing to pay higher prices, than they would have paid in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Gilead's conduct unlawful.

### CLAIM SEVEN: CONSPIRACY IN RESTRAINT OF TRADE
### (GILEAD--SPECIFIED DRUGS)

344.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 295 above.  This claim is asserted against Defendant Gilead.

345.    Gilead violated 15 U.S.C. § 1 by entering into a continuing unlawful contract, combination and conspiracy in restraint of trade with Janssen Products L.P. ("Janssen") by, *inter alia*: (a) agreeing to and abiding by the No-Generics Restraints relating to Complera, Odefsey, Prezcobix, and Symtuza; and (b) agreeing that, in exchange for Janssen's No-Generic Restraint relating to Odefsey, Gilead would provide a reciprocal No-Generics Restraint with respect to Prezcobix and Symtuza.

346.    At all relevant times, Gilead possessed substantial market power (*i.e.*, monopoly power) with respect to Complera and Odefsey and their respective AB-rated generic equivalents. At all relevant times, Janssen possessed substantial market power (*i.e.*, monopoly power) with respect to Prezcobix and Symtuza and their respective AB-rated generic equivalents.  Each firm

74

1  possessed the power to control prices in, prevent prices from falling in, and exclude competitors

2  from the relevant market.

3       347.   That market power is coupled with strong regulatory and contractual barriers to

4  entry into the market.

5       348.   As alleged extensively above, Gilead and Janssen knowingly, willfully and

6  unlawfully conspired to restrict competition and maintain monopoly power by entering into the

7  No-Generic Restraint agreements specified above.

8       349.   To the extent that Gilead is permitted to assert one, there is and was no

9  cognizable, procompetitive justification for Gilead's exclusionary conduct that outweighs its

10  harmful effects. Even if there were some conceivable justification that Gilead were permitted to

11  assert, the conduct is and was broader than necessary to achieve such a purpose.

12       350.   Plaintiffs have been injured, and absent injunctive relief will continue to be

13  injured, in their business and property as a result of Gilead's unlawful conspiracy in restraint of

14  trade.  Plaintiffs' injury consists of having paid higher prices for their requirements of Complera,

15  Odefsey, Prezcobix and Symtuza, and continuing to pay higher prices, than they would have paid

16  in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed

17  to prevent, and flows from that which makes Gilead's conduct unlawful.

18  **CLAIM EIGHT: CONSPIRACY IN RESTRAINT OF TRADE**
                 **(GILEAD AND BMS—EVOTAZ)**

19

20       351.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through

    295 above.  This claim is asserted against Defendants Gilead and BMS.

21

22       352.   Gilead and BMS violated 15 U.S.C. § 1 by entering into a continuing unlawful

    contract, combination and conspiracy in restraint of trade consisting of the No-Generics Restraint

23

relating to Evotaz.

24       353.   At all relevant times, BMS possessed substantial market power (*i.e.*, monopoly

25  power) with respect to Evotaz and its AB-rated generic equivalents.  BMS possessed the power to

26  control prices in, prevent prices from falling in, and exclude competitors from the relevant

27  market.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

354.     That market power is coupled with strong regulatory and contractual barriers to entry into the market.

355.     As alleged above, Gilead and BMS knowingly, willfully and unlawfully conspired to restrict competition and maintain monopoly power by entering into the No-Generics Restraint agreement relating to Evotaz.

356.     To the extent that Defendants are permitted to assert one, there is and was no cognizable, procompetitive justification for their exclusionary conduct that outweighs its harmful effects. Even if there were some conceivable justification that Defendants were permitted to assert, the conduct is and was broader than necessary to achieve such a purpose.

357.     Plaintiffs have been injured, and absent injunctive relief will continue to be injured, in their business and property as a result of Gilead's and BMS's unlawful conspiracy in restraint of trade relating to Evotaz.  Plaintiffs' injury consists of having paid higher prices for their Evotaz requirements, and continuing to pay higher prices, than they would have paid in the absence of the antitrust violation. Such injury is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.

## XII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request entry of judgment against Defendants and the following relief:

A.     A declaration that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act;

B.     Permanent injunctive relief enjoining Defendants from continuing their illegal conduct and requiring them to take affirmative steps to dissipate the continuing effects of their prior conduct;

C.     An award of Plaintiffs' overcharge damages, in an amount to be determined at trial, trebled;

D.     An award of Plaintiffs' costs of suit, including reasonable attorneys' fees as provided by law; and

E.     Such other and further relief as the Court deems just and proper.

76

1

### XIII.   JURY DEMAND

2
Plaintiffs demand a trial by jury on all issues so triable.

3
Dated: September 22, 2021

4

Respectfully submitted,

5
/s/ Anna T. Neill

6
Anna T. Neill

Kenny Nachwalter P.A.

7
Four Seasons Tower, Suite 1100

1441 Brickell Avenue

8
Miami, FL 33131

9
Telephone: (305) 373-1000

Facsimile: (305) 372-1861

10
Email: aneill@knpa.com

*Attorneys for Plaintiffs*

11
Of counsel:

12

Scott E. Perwin

13
Lauren C. Ravkind

Kenny Nachwalter P.A.

14
Four Seasons Tower, Suite 1100

1441 Brickell Avenue

15
Miami, FL 33131

16
Telephone: (305) 373-1000

Facsimile: (305) 372-1861

17
Email: sperwin@knpa.com

Email: lravkind@knpa.com

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL